UNITED STATES of America, Plaintiff-Appellee,

v.

Eddie L. MacCLAIN, Defendant-Appellant.

No. 73–1851.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted July 9, 1974.

Decided Aug. 16, 1974.

Rehearing Denied Sept. 23, 1974.

Donald S. Molen, Denver, Colo., for defendant-appellant.

Richard Slivka, Asst. U. S. Atty. (James L. Treece, U. S. Atty., on the brief), for plaintiff-appellee.

Before HILL, MOORE * and DOYLE, United States Circuit Judges.

HILL, Circuit Judge.

Eddie MacClain was indicted by a federal grand jury in Colorado on five counts of securities fraud and mail fraud, in violation of 15 U.S.C. §§ 77q(a) and 77x, and of 18 U.S.C. §§ 2 and 1341. He subsequently was convicted by a jury on all counts.

The following evidence was adduced at trial. In the summer of 1966, MacClain and Kenneth Cook decided to establish a mail order business in Denver, Colorado. Neither one had the necessary financial resources for the venture, and so a third person was persuaded to put up $10,000 for initial operating capital. The business became operational that fall and was incorporated under the name of Cherry Creek International, Ltd. (later changed to House of Knowledge, Inc.). Cook became its president and MacClain its secretary-treasurer. Each was to receive a monthly salary of $1,000.

Corporate efforts were directed toward the publication and sale of an instruction manual for operating a mail order business, the sale of do-it-yourself and self-improvement books in model bookstores, and an attempt to franchise bookstores. The business, however, proved to be less than successful. Fewer than 100 copies of the mail order book were sold, and the do-it-yourself and self-improvement books were just as unpopular. In fact, the corporation realized only $814 from the sale of books. The corporation's model bookstores, all located in Denver, either lasted only a short while or never became fully operational due to lack of funds. Finally, all attempts to franchise its bookstores were fruitless.

The corporation never operated at a profit [1] and finally ceased doing business in the summer of 1970. Its only assets at that time were various records, a claimed copyright on its mail order book, and $10.70 in the corporate checking account.

The corporation's income was derived primarily from the sale of its stock. Stock sales amounted to over $160,000. Although the book value of the stock never exceeded $2.20 per share, it was sold at prices ranging from ten to fifty dollars per share. The record discloses that MacClain had the primary responsi-

---

* Honorable Leonard P. Moore, Second Circuit, sitting by designation.

1. On March 31, 1969, its accumulated loss exceeded $91,000. A staff accountant for the Securities & Exchange Commission testified, at trial, that this loss increased during the remainder of the corporation's existence.

bility for selling stock.[2] He was aided in his solicitation efforts by Albert Sobie, an insurance salesman who introduced MacClain to his clients. In return, Sobie received a 20 percent commission on the sales.

Five stockholders testified at trial about their course of dealings with MacClain. His approach was essentially the same toward all of them. Accompanied by Sobie, he would visit a potential investor's home and explain his corporation's operations. Although he was aware that the corporation was in poor financial health and that its product was not selling, he did not tell this to potential investors. Instead, he described the corporation's activities in very positive terms, to say the least. The corporation was doing well, he said, and planned to open (up to 100) new bookstores. Proceeds from the sales of stock were to be used for this purpose. Phoenix, Dallas and Atlanta were mentioned as possible locations. New books were to be purchased at very low prices and sold at a big profit. Although denied by MacClain at trial, stockholders said he informed them that he was an attorney and an accountant (he was not), and that the corporation had met all state and federal securities requirements.

Cook testified, at trial, that the articles of incorporation authorized 25,000 shares of stock and that there was never a shortage of available stock. MacClain, however, told potential investors there was a limitation on the number of shares available and the stock was selling fast. Purchases should be made immediately.

MacClain also described the expected return on the investment in glowing terms. Dividends would be paid quarterly and would begin in several months. One could expect, he told various investors, that the first dividend would almost pay for the price of the stock, that the investment would make a lot of money, and that the first year's dividends would be around $10,000. Approximately fifty-seven persons invested in the corporation. Not one of them received any dividends.

The Securities & Exchange Commission (SEC) commenced an investigation into the corporation's activities in January, 1970. A grand jury subsequently returned a five count indictment against MacClain on May 4, 1973. The indictment alleged, *inter alia*, that MacClain employed a scheme, device and artifice to fraudulently obtain money and property by means of untrue statements of material fact and omissions of material fact; that the corporation was merely a facade to create the appearance of a legitimate business concern; that funds obtained from investors were converted and used to pay finders' fees and salaries, that MacClain, as part of a scheme to defraud, distributed material through the mails containing misleading statements about the corporation; and that MacClain had knowingly made false and misleading statements to prospective investors.

MacClain was tried before a jury in the United States District Court for the District of Colorado and was convicted on all five counts.

On appeal, MacClain first argues the trial court erred in denying his pre-trial motion to dismiss because pre-indictment delay violated his rights to due process and a speedy trial under the Fifth and Sixth Amendments to the United States Constitution.

The government's investigation was commenced on January 19, 1970, and MacClain was indicted 39 months later on May 4, 1973. He argues that because of this delay correspondence, records and files have been lost or misplaced, and that witnesses' memories have dimmed. He also indicates that further investigation into the matter may show

---

2. Cook testified that MacClain's other duties included: keeping the corporate records; keeping and preparing the stock certificates; preparing stockholders' reports; and preparing correspondence.

the delay was purposefully designed to gain a tactical advantage.

■■ The argument is without merit. A defendant's rights under the Fifth Amendment's due process clause are not violated in the absence of a showing that actual prejudice has resulted from the pre-indictment delay and that the delay was purposefully designed to gain some tactical advantage or to harass the defendant. United States v. Beitscher, 467 F.2d 269 (10th Cir. 1972). MacClain's allegations in this regard are unsupported. The record does not disclose the loss to him of any exculpatory evidence or that the government delayed to secure a tactical advantage. All MacClain can point to is the length of time, which is not unreasonable in view of the fact that a complex mail fraud/securities fraud case such as this calls for extensive and careful preparation and organization. See, e. g., United States v. MacKay, 491 F.2d 616 (10th Cir. 1973).

■■ Nor is the Sixth Amendment's speedy trial guarantee available to MacClain. It is applicable only after a defendant has been accused, United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), which in the instant case did not occur until Mac-

Clain was indicted. We are convinced that he had a fair trial and was deprived of no Fifth or Sixth Amendment rights.

■ MacClain next contends the evidence does not support a conviction under 15 U.S.C. § 77q(a) [3] and 18 U.S.C. § 1341 [4] because the government failed to prove that any statements or representations he made were false or misleading. In deciding this issue we must view the evidence presented in the light most favorable to the government. United States v. Twilligear, 460 F.2d 79 (10th Cir. 1970).

The record indicates that some of the statements MacClain made to prospective investors were knowingly false. Stockholders testified he said he was an accountant and a lawyer, when he was neither. And although the corporation was not registered with the SEC, he said it had met all federal and state securities laws. He also stated that the corporation was doing well when in fact he knew that it had never operated profitably. Furthermore, he stated that proceeds from the sale of stock were to be used to open up new bookstores. The record discloses, however, that almost 60 percent of these funds were used to pay salaries, commissions and expenses. Mac-

---

3. 15 U.S.C. § 77q(a) provides:
(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

4. 18 U.S.C. § 1341 provides:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or

for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated as held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Clain said he had borrowed money to invest in the corporation, when he had not. Finally, he told prospective investors there was a limitation on the amount of stock available and that only a "few shares" or a "little dab" was left. Yet Cook testified that 25,000 shares were authorized and there never was a shortage of stock.

It also appears that MacClain neglected to inform potential investors of the corporation's true financial status. They were not told that the corporation was operating at a loss, that it did not have funds to stock its bookstores, that the books were not selling, or that a franchise had never been successfully sold. The statements he did make, however, were obviously misleading when considered in the light of the corporation's true status. MacClain said the stock was selling fast and needed to be purchased immediately. He also said that 100 new bookstores were to be opened and that stock dividends were to be paid quarterly. He told one potential investor that the first dividend would almost pay for the price of the stock, and that the first year's return should be enough to pay for a vacation. Yet another potential investor was told that the first year's dividends would be approximately $10,000. In October, 1968, he told one investor that stock dividends would begin in April, 1969, and yet in June, 1969, he told another investor that dividends would not begin for at least one year.

The record thus discloses that some of the statements MacClain made were knowingly false. The inescapable conclusion as to the remaining statements is that he heedlessly and recklessly made them in the face of danger signals indicating the corporation's financial condition did not warrant such positive representations. We believe that a sufficient quantum of evidence exists by which the jury could find that MacClain made false and misleading statements.

■ Nevertheless, MacClain denies making these statements and argues

that the investor-witnesses lacked credibility. We are not persuaded by this assertion. Evaluating the credibility of witnesses is a matter for the jury and not a function of an appellate court. United States v. Brumley, 466 F.2d 911 (10th Cir. 1972), cert. denied, 412 U.S. 929, 93 S.Ct. 2755, 37 L.Ed.2d 156.

■ MacClain's third argument is that the government failed to prove, as required by 18 U.S.C. § 1341, that his use of the mails was for the purpose of executing a scheme. Count V of the indictment is the only count alleging a violation of § 1341. It alleges, *inter alia*, that MacClain mailed a stock certificate to Mr. and Mrs. O. B. Shawcroft on November 8, 1968, as part of a scheme to defraud.

The following evidence was introduced at trial concerning the allegations of this count. Mrs. Shawcroft testified that MacClain visited her home on November 7, 1968, informed her of his corporation's operations, and asked if she would be interested in buying some stock. Shawcroft replied that she did not have the money but that she did have some insurance policies. MacClain explained that she could draw money on the policies and told her how much she could get on each one. She agreed to buy 100 shares of stock, gave MacClain a personal check, and said the check was not good and that he would have to hold it for a while. MacClain agreed and gave her a receipt. The following day he mailed her a certificate representing 100 shares of stock, and thereafter returned to Shawcroft's home to exchange the original check for another.

Relying upon United States v. Lynn, 461 F.2d 759 (10th Cir. 1972), MacClain contends his incidental utilization of the mails did not meet the requirements of § 1341 because the transaction already was fully consummated. We believe *Lynn* is inapplicable here. It involved a BankAmericard credit card, allegedly stolen from the mails, and used to purchase items from retail merchants. The government contended § 1341 had been

violated because the mails were subsequently utilized to return the credit card sales drafts to BankAmericard. This Court held § 1341 was inapplicable because the allegedly fraudulent transaction had been completed upon receipt of the purchased items.

In *Lynn* the mailings (sales drafts) were directed toward a third party (BankAmericard) and were not an integral part of the transaction. In fact, a defendant in such a case probably would prefer to have the credit card sales drafts misplaced or lost by the retail merchants and never mailed at all.

In the instant case, however, the mailing played a significant part in enabling MacClain to acquire and maintain dominion over the stock proceeds. To be sure, he had obtained Shawcroft's check before he mailed the stock certificate. But Shawcroft did not have the necessary funds in her checking account to pay the check. Even if sufficient funds did exist she could order the bank to stop payment on the check if she suspected foul play. The subsequent mailing was necessary to lull her into a false sense of security, postpone any possible inquiries or complaints to the authorities, and therefore make the transaction less suspect than if no mailing had taken place. *See, e. g.*, United States v. Maze, 414 U.S. 395, 94 S.Ct. 645, 38 L. Ed.2d 603 (1974); United States v. Sampson, 371 U.S. 75, 83 S.Ct. 173, 9 L. Ed.2d 136 (1962); Beasley v. United States, 327 F.2d 566 (10th Cir. 1964), cert. denied, 377 U.S. 944, 84 S.Ct. 1351, 12 L.Ed.2d 307. We conclude that ample evidence exists to prove that MacClain used the mails for the purpose of executing a scheme.

MacClain also raises a number of objections regarding the admissibility of evidence and various instructions.

■ First, MacClain argues the trial court committed prejudicial error by admitting into evidence, over objection, Shawcroft's testimony that she borrowed money on her insurance policies to purchase stock. He relies on Getchell v. United States, 282 F.2d 681 (5th Cir. 1960), in support of this contention. *Getchell* involved a mail fraud prosecution. During the trial an investor-witness volunteered testimony that another person had borrowed money on an insurance policy for investment purposes, in an attempt to prejudice the jury. The appellate court reversed the conviction on the grounds, *inter alia*, that the cumulative effect of *all* the uncorrected trial errors prejudicially influenced the jury.

That is not the situation now before us. Here, the testimony regarding the insurance policy does not appear to have been designed to prejudice the jury or elicit its sympathy. Nor were there any uncorrected evidentiary rulings which, together with the one in issue, could cumulatively amount to error. The testimony was probative of MacClain's scheme and intent to defraud, and was not prejudicial.

■ The trial court also erred, it is asserted, by giving certain instructions which had a prejudicial effect and by failing to give a specific instruction on 18 U.S.C. § 2. Our search of the record does not disclose that MacClain either requested a specific instruction regarding § 2 or that he objected to the instructions that were given. He therefore is barred from raising any such arguments under Rule 30, F.R.Crim.P. That rule states, in part:

No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. *See also*, United States v. Wheeler, 444 F.2d 385 (10th Cir. 1971); Lucero v. United States, 311 F.2d 457 (10th Cir. 1962), cert. denied, 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed.2d 767.

Finally, MacClain contends his rights have been violated under the Eighth

Amendment to the United States Constitution.[5] He asserts his pre-indictment delay constituted an unreasonable and oppressive period of anxiety and therefore amounted to cruel and unusual punishment, and that his 4½ year prison sentence for commission of a "white collar crime" also constituted cruel and unusual punishment. We do not agree.

As regards the pre-indictment delay, MacClain's allegation is unsupported. Surely, every person faced with the possibility of criminal charges being filed against him has anxieties. But this does not approach the extreme type of conditions that must be established to show an Eighth Amendment violation. Moreover, that amendment's purpose is not to require that criminal prosecutions be filed within a certain length of time. Such is the purpose of the applicable statute of limitations.

MacClain was sentenced to 4½ years imprisonment as to Count I, and was granted probation as to the remaining four counts. He concedes that the length of the sentence was statutorily authorized. *See* 15 U.S.C. § 77x and 18 U.S.C. § 4202. Nevertheless, he argues the sentence is excessive for a 65 year old man who commits a white collar crime "which merely goes to the degree of economic losses to individuals in society."

A sentence within the statutory limits is not cruel and unusual punishment. Page v. United States, 462 F.2d 932 (3rd Cir. 1972). Absent a showing of illegality or abuse of discretion, such a sentence will not be disturbed on appeal. *See* Cooper v. United States, 403 F.2d 71 (10th Cir. 1968); Smith v. United States, 273 F.2d 462 (10th Cir. 1959), cert. denied, 363 U.S. 846, 80 S.Ct. 1619, 4 L.Ed.2d 1729. The record in this case reveals neither an abuse of discretion nor any illegality in the manner or length of sentence.

The conviction is affirmed in all respects.

5. "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S.Const. Amend. VIII.