**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Amos PINO, Defendant-Appellant.**

No. 81–1538.

United States Court of Appeals,
Tenth Circuit.

May 26, 1983.

Dana L. Larson, Littleton, Colo., for defendant-appellant.

Richard J. Smith, Asst. U.S. Atty., Albuquerque, N.M. (William L. Lutz, U.S. Atty., and Benjamin Silva, Jr., Asst. U.S. Atty., Albuquerque, N.M., were on the brief), for plaintiff-appellee.

Before HOLLOWAY, BARRETT and SEYMOUR, Circuit Judges.

HOLLOWAY, Circuit Judge.

Defendant-appellant Amos Pino, an Indian, brings this timely appeal from his conviction, after a jury trial, of involuntary manslaughter,[1] a lesser included offense of the second degree murder offense charged by indictment, in the beating death of James Coho, another Indian, in Indian Country in violation of 18 U.S.C. § 1153 and § 1111.[2]

For reversal, defendant argues (1) that the twenty-eight month delay between his offense and the indictment was violative of his Fifth Amendment due process rights; (2) that the trial court erred by denying defendant's motion to dismiss on the basis of prosecutorial misconduct before the grand jury; and (3) that he was deprived of his right to a fair and impartial jury by the

---

1. 18 U.S.C. § 1112 provides, in pertinent part:
   Manslaughter
   (a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:
   Voluntary—Upon a sudden quarrel or heat of passion.
   Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, or a lawful act which might produce death.
   (b) Within the special maritime and territorial jurisdiction of the United States,

   Whoever is guilty of involuntary manslaughter, shall be fined not more than $1,000 or imprisoned not more than three years, or both.

2. 18 U.S.C. § 1153 provides, in pertinent part:
   Offenses committed within Indian country
   Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely,

murder, manslaughter ... within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.
18 U.S.C. § 1111 provides, in pertinent part:
   Murder
   (a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.
   Any other murder is murder in the second degree.

jury selection procedures used in the District of New Mexico.

## I

Considered in the light most favorable to the Government as it must be after the jury's verdict, the evidence tended to show the following circumstances:

On October 6, 1978, at about noon, defendant Amos Pino, his brother Elton Pino, and Wilfred Martine rode on horseback from their homes at the Indian community of Ramah to a bar named "Pablo's." There, they met with other Indians and drank beer and wine, and some whiskey. In late afternoon these three, along with James Coho and Vance Jake started back toward Ramah on horseback. Coho initially rode with defendant, but later switched to Jake's horse, at which point defendant rode ahead of the group.

During defendant's absence, Coho and defendant's brother Elton had an argument. The argument resulted in a brief scuffle, and Coho bloodied Elton's nose. The argument ceased, and the group proceeded onward. Upon defendant's return to the group, he demanded an explanation for his brother's bloodied nose. Fearing a beating, Jake left the scene on foot. Coho attempted to escape on horseback, but was overtaken by defendant and Elton. Martine testified that Coho dismounted and was beaten to the ground and kicked about the head and body by defendant and Elton. Defendant walked a few feet away from Coho and picked up a rock and came back and hit Coho's head; after defendant hit Coho with the rock, Martine felt bad and left the scene. (III R. 103–105, 143).

When Martine left he was followed by defendant and Elton. Jake returned, saw Coho's body lying at the side of the road, and ran home on foot.

The following morning Jake returned to the scene and found Coho groaning, still unconscious, his face swollen. He summoned assistance and Coho was eventually transported to an Albuquerque hospital. Despite emergency surgery, Coho died without ever regaining consciousness. The Medical Examiner's testimony was to the effect that Coho's death resulted from blunt blows to Coho's head, which caused his brain to hemorrhage and uncontrollably swell.

The F.B.I. began its investigation of the incident on October 11, 1978, the day of Coho's death, and completed the investigation on January 30, 1979.[3] (II R. 45–46). Defendant was interviewed twice, once in October and once in November 1978, both times denying any knowledge of the cause of Coho's fatal injuries. (II R. 32–33; see Defendant's Exhibits 8 and 9). Elton Pino was interviewed twice, on October 20 and November 17, 1978, and gave conflicting statements, the second of which implicated defendant in Coho's death. (See Defendant's Exhibits 2 and 3). Wilfred Martine was interviewed twice, on October 25 and 27, 1978, and gave conflicting statements, the second of which also implicated defendant in Coho's death. (See Defendant's Exhibits 4 and 5). Martine testified in conformity with the second statement at trial.

Calvin Guyman, the F.B.I. agent in charge of the case, testified that on completion of the investigation, he transmitted a report, including the report of the autopsy performed on Coho, to the United States Attorney's office in Albuquerque. (II R. 46). The United States Attorney reviewed the case and in June 1979, fearing a jurisdictional problem between the state and federal governments, requested that Guyman discuss the matter with the Valencia County, New Mexico, District Attorney to see if the matter might better be prosecuted by the state. Accordingly the matter was transferred to the state district attorney's office for review in July 1979. (II R. 46–47, 53).

---

**3.** The F.B.I. agent in charge of the case conducted an additional investigation in August 1980 to determine whether the Ramah area was a dependent Indian community. (II R. 49, 51–52). On cross-examination, he testified that the area's status had not changed since the time of the 1978 investigation and that its status could have been determined at that time. (II R. 52–53).

Guyman maintained contact with the state district attorney's office throughout the fall of 1979 and was advised that they were quite busy, but that they would review the case for possible submission to a state grand jury. In March 1980 the state district attorney, reluctant to proceed in an Indian case where jurisdiction was uncertain, transferred the case back to the United States Attorney's office. (II R. 47–48).

In May 1980 the United States Attorney's office in Albuquerque made the decision to proceed in the case. The Assistant United States Attorney recommended prosecution of Elton Pino before proceeding against defendant Amos Pino based on his evaluation that the case against Elton was the stronger one—there was a confession by Elton, but there was no confession by Amos Pino[4]—and the statements concerning Amos's involvement were conflicting. (V R. 493–94). A juvenile proceeding was brought against Elton concerning the homicide and it resulted in an acquittal in October 1980. (See V R. 495).

Following Elton Pino's acquittal, the prosecuting attorney submitted evidence concerning Amos Pino's part in the beating of Coho to a federal grand jury on January 6, 1981. Elton Pino appeared and testified pursuant to subpoena. Elton first said that he had no knowledge of defendant's involvement in Coho's death. (Defendant's Exhibit 1 at 8–16). When he was confronted with his November 17, 1978, statement (Defendant's Exhibit 2), and after the prosecuting attorney said he would call as witnesses the F.B.I. agent and the B.I.A. agent who had taken that statement, Elton testified in accord with the statement that he and Amos had indeed beaten Coho. (Defendant's Exhibit 2 at 26–27, 29–33).

On February 11, 1981, the grand jury returned the instant second degree murder indictment charging that the defendant, an Indian, in the dependent Indian community of Ramah in Indian Country in New Mexico, did unlawfully kill James Coho, another Indian, with malice aforethought, in viola-tion of 18 U.S.C. § 1153 and § 1111. Defendant moved both before and after trial for dismissal of the indictment on grounds of pre-indictment delay, prosecutorial misconduct before the grand jury, and invalid jury selection procedures. On both occasions the trial court held evidentiary hearings and denied defendant's motions. (II R. 1–80; V R. 491–550).

The case was tried to a jury. The version of the facts outlined above implicating Amos Pino in the kicking and beating of Coho was basically from the testimony of Wilfred Martine and Vance Jake. Elton Pino did not testify at the trial of his brother, Amos Pino.

Defendant Amos Pino took the stand at trial and testified that on October 6, 1978, he was at the bar and the group drank beer and also from three pints of "Thunderbird" wine they had. (Id. at 373, 422). Amos testified that they left the bar about five o'clock p.m.; after riding around, Amos went up on a hill, came back down and saw Elton had blood on his nose and shirt and hat (IV R. 396); Amos helped Elton get on Amos's horse; Amos saw Martine, but left Martine behind and Amos and Elton went to their aunt's place, and later that night, on to their parents' home. Amos vigorously denied attacking Coho at any time or seeing him injured; he said that at the time he last saw Coho, Coho was riding back toward the bar. (Id. at 407, 428).

Defendant's and Elton's sisters, Jean Pino and Lisa Pat, and Albert Pat, Lisa's husband, testified that in early 1981, while they were at a friend's home with their parents and other family members present, Elton came in drunk and so violent that he had to be tied up. Elton stated that he had killed James Coho. Jean Pino testified that Elton said "Go ahead and tell on me. I did it." (IV R. 344–45, 348–49, 351–52). Jean Pino further testified that Elton, while drunk, had approached her at a state fair in October 1978 and said he had killed James Coho, stating: "I killed him." (IV R. 341–43).

---

4. Elton's second statement to the F.B.I. agents which implicated the defendant also constitut-ed a confession to his participation in Coho's beating. (See Defendant's Exhibit 2).

The jury returned a verdict of guilty against defendant Amos Pino on the lesser included offense of involuntary manslaughter. Defendant was sentenced to three years' imprisonment. (I R. 90, 135; V R. 548).

## II

■ Defendant first contends that the delay of approximately twenty-eight months from the time of his offense until the indictment was returned violated his Fifth Amendment due process rights.[5]

The Supreme Court has held that although a defendant's primary protection against the Government's prosecution of overly stale criminal charges is the statutes of limitations, the Fifth Amendment's Due Process Clause does have a "limited role to play in protecting against oppressive delay." *United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977).

Under *Marion* and *Lovasco* we have applied a two-part due process test to identify oppressive pre-indictment delay violative of the Fifth Amendment:

> [T]he rights of a defendant under the due process clause of the Fifth Amendment are not violated in the absence of a showing of actual prejudice resulting from the preindictment delay and that the delay was purposefully designed to gain tactical advantage or to harness the defendants.

*United States v. Revada,* 574 F.2d 1047, 1048 (10th Cir.1978), *quoting United States v. Beitscher,* 467 F.2d 269, 272 (10th Cir. 1972).[6]

■ We conclude that defendant's due process rights have not been violated by the pre-indictment delay here. First, defendant has neither shown nor alleged actual prejudice resulting from such delay sufficient to infringe his Fifth Amendment rights. "Claims of deprivation of due process rights require a specific showing of identifiable prejudice to the accused affecting his substantial rights." *United States v. Comosona,* 614 F.2d 695, 697 n. 3 (10th Cir.1980). Defendant must show actual and not speculative prejudice to his defense occasioned by the passage of time. *See, e.g., United States v. McManaman,* 606 F.2d 919, 923 (10th Cir.1979); *United States v. Revada,* 574 F.2d 1047, 1049 (10th Cir.1978).

Defendant claims that the twenty-eight month delay prejudiced his defense in that (1) Wilfred Martine, a key prosecution witness, was accosted and beaten by relatives of Coho, thus causing Martine to testify as to defendant's guilt, (2) certain photographs of the scene of Coho's beating, taken by Government officials, were misplaced and were not located until after trial, (3) the doctor who examined Coho's brain died approximately a year before trial and was therefore unavailable to testify, and (4) defendant suffered mental anguish throughout the twenty-eight month period. (*See* Brief of Appellant at 2–7; I R. 4, 116–23).

As noted, defendant moved for dismissal of the indictment because of impermissible pre-indictment delay and the trial court held evidentiary hearings on the matter both before and after trial. (II R. 1–81; V R. 490–550). At the conclusion of both hearings, the judge denied defendant's motion, based on his finding that defendant

---

5. The Sixth Amendment guarantee of a speedy trial is inapplicable to this twenty-eight month period preceding defendant's indictment. In *United States v. Marion,* 404 U.S. 307, 313–20, 92 S.Ct. 455, 459–63, 30 L.Ed.2d 468 (1971), the Supreme Court held that the "Sixth Amendment speedy trial provision has no application until the putative defendant in some way becomes an 'accused....'" Events which trigger Sixth Amendment protection are "indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge...." *Id.* at 320, 92 S.Ct. at 463. Defendant's two interviews by

F.B.I. agents, his only contact with the authorities prior to his indictment, were insufficient to trigger the Sixth Amendment's protection.

6. *Accord, United States v. Jenkins,* 701 F.2d 850, 854 (10th Cir.1983); *United States v. Gutierrez,* 696 F.2d 753 (10th Cir.1982); *United States v. McManaman,* 606 F.2d 919, 922–23 (10th Cir.1979); *United States v. Redmond,* 546 F.2d 1386, 1388 (10th Cir.1974), *cert. denied,* 435 U.S. 995, 98 S.Ct. 1645, 56 L.Ed.2d 83 (1978); *United States v. MacClain,* 501 F.2d 1006, 1010 (10th Cir.1974).

had shown no actual prejudice resulting from the delay. (I R. 29; V R. 541–42).[7] We are unpersuaded that the trial court's findings are clearly erroneous and therefore may not set them aside. *United States v. Comosona,* 614 F.2d at 697 n. 4.

First, Martine was allegedly beaten by the relatives of the deceased, Coho, at least three times during the period following Coho's death. Beatings were said to have occurred shortly after the death of Coho on October 11, 1978, again in late 1979 or early 1980, and again just prior to Elton's trial in October 1980. Defendant says the pre-indictment delay permitted this intimidation of the prime witness against him. (I R. 116–18). However, the argument rests on speculation and not on proof that Martine was compelled to testify falsely, and we find it is without merit.

Second, we have examined the missing photographs, absent at trial and subsequently recovered prior to the evidentiary hearing. We accept the trial judge's conclusion that they add nothing substantial to the photographs which were introduced at trial, and no showing is made of any actual prejudice suffered by the defendant in this connection. (V R. 542; *see* Government Exhibits 1A–1E, B1–B5).

Third, the trial court concluded that there was no showing of prejudice from the fact that the doctor who examined Coho's brain was unavailable to testify (V R. 541); indeed, defendant makes no showing or allegation that the deceased doctor's testimony would have been any different from or any more complete than that of the doctor who did testify. (*See* Brief of Appellant at 7). As stated in *United States v. McManaman,* 606 F.2d 919, 923 (10th Cir.1979):

We cannot agree that any actual prejudice to defendant has been shown. The mere allegation that the deceased ... could have testified for the defendant does not establish that he would have so testified or that his testimony would have been helpful.

■ Finally, defendant complains of mental anguish resulting from the Government's delay in seeking an indictment. There were two interviews of defendant by the F.B.I. in the interim. However, this vague claim is unconvincing as an element of harm from pre-indictment delay.[8]

Further, defendant fails to establish that the Government purposefully caused the pre-indictment delay to gain a tactical advantage or to harass him. We find no evidence to support such a contention. Defendant appears to argue that the Government's decision to prosecute Elton Pino before proceeding against the defendant constitutes such an impermissible tactical maneuver. (Brief of Appellant at 3, 8). The uncontroverted testimony indicates, however, that the decision to proceed first against Elton was based on the Government's belief that its case against him was stronger, and that the outcome of Elton's juvenile proceeding would help the Government to reach a decision as to how to proceed against the defendant. (V R. 494–95). We find nothing improper in the decision made in that regard. Furthermore, the Government points to the delay resulting from uncertainty as to whether the State of New Mexico or the federal authorities should proceed in the matter. (II R. 47–49). Again such delay did not violate the defendant's Fifth Amendment rights.

Uncertainty as to the validity or strength of the prosecution's case is ... a

---

7. We note the trial court's remarks as to the unconscionability of the Government's delay in the prosecution of this case (II R. 78–80; V R. 540–42), and we share his concern. As discussed above, however, and as held by the trial judge, defendant's Fifth Amendment rights have not been violated.

8. Mental anguish is a proper factor to consider in evaluating a defendant's claim of prejudice resulting from a Sixth Amendment speedy trial

violation. *See United States v. Jenkins,* 701 F.2d 850, 857 (10th Cir.1983), and cases cited therein. Defendant's cited case, *United States v. Dreyer,* 533 F.2d 112, 115 (3d Cir.1976), speaks of prejudice caused by a speedy trial delay, not prejudice caused by a pre-indictment delay as is alleged here. Obviously the anxiety experienced after charges are actually brought is more substantial and of actual impact on the defendant.

legitimate reason for delay in obtaining an indictment as is the availability and likelihood of prosecution by another jurisdiction.

*United States v. Revada,* 574 F.2d 1047, 1050 (10th Cir.1978); *see United States v. Lovasco,* 431 U.S. 783, 794 n. 15, 97 S.Ct. 2044, 2051 n. 15, 52 L.Ed.2d 752.

In sum, the defendant has not satisfied either part of the two-part test for establishing a due process violation by pre-indictment delay.

### III

Defendant next contends that the trial judge erred by denying defendant's motion to dismiss the indictment on the basis of prosecutorial misconduct before the grand jury. Defendant argues that the prosecuting attorney's conduct in examining Elton Pino amounted to harassment and intimidation; that the use of Elton's second statement to F.B.I. agents (Defendant's Exhibit 2), which had been suppressed in Elton's juvenile proceeding as not voluntarily and intelligently given (*See* V R. 537), went far beyond impeachment and was therefore improper; and that these tactics unfairly affected the grand jury's independent judgment, thus dictating dismissal of the indictment.

Elton Pino testified before the grand jury which indicted defendant. (*See* Defendant's Exhibit 1—Transcript of Proceedings Before the Grand Jury). Elton first testified, in line with his first statement to the F.B.I. agents (Defendant's Exhibit 3), that he and his brother Amos were not involved in Coho's death, that they last saw Coho alive and riding away from them; further, he testified that, contrary to the information contained in his second statement (Defendant's Exhibit 2), he never told the F.B.I. agents that he and his brother beat Coho. (*See* Defendant's Exhibit 1 at 7–15, 22).

Following this testimony, in the grand jury's presence the prosecuting attorney read portions from the second statement to Elton and questioned him about them. (Defendant's Exhibit 1 at 13–14). This second statement had been suppressed at Elton's juvenile proceeding based on the Judge Mechem's findings that the statement was not voluntarily and intelligently made, that Elton was 15 at the time and his parents were not allowed to be with him, and that he did not understand anything about the warnings given him. (V R. 537).

Further, the prosecuting attorney twice told Elton that the F.B.I. agent and the B.I.A. agent to whom he gave his second statement were willing to testify under oath that he had told them of Amos's and his involvement in Coho's death. The prosecutor asserted to Elton, "no, you didn't" give the agents a statement denying involvement by him and Amos in Coho's death, as Elton maintained; "you told them [you saw your brother, Amos Pino, throw a rock on James Coho's head]." The Government interpreter handling translation with Elton in Navajo then stated, "He's getting confused." (Defendant's Exhibit 1 at 22–23, 27).

Further, the prosecuting attorney told Elton that to tell a lie before the grand jury is a crime and he asked Elton if he knew what a lie was. (Defendant's Exhibit 1 at 25–26). At this point Elton admitted that he had been lying, that the information contained in the second statement was true, and that he had been afraid to say so because he was afraid of what might happen at home if he were to testify unfavorably to the defendant. (Defendant's Exhibit 1 at 27–28, 33). From that point on Elton's testimony was that Amos did strike and kick Coho and that he struck Coho in the back of the head with a rock. (Defendant's Exhibit 1 at 27–33, 35–36).

Chief Judge Bratton, the trial judge in the instant case, expressed profound concern about the prosecutorial conduct in using the suppressed statement of Elton Pino in confronting and impeaching Elton before the grand jury, and in threatening him with the testimony of witnesses to testify as to the giving of the suppressed statement, and with perjury charges. The judge referred to the findings made by Judge Mechem in Elton's juvenile trial that the statement

was not voluntarily and intelligently given and that Elton did not understand the warnings being given to him, so that there was a lack of showing of trustworthiness of the statement. (V R. 537). While Judge Bratton denied the motion for judgment of acquittal and to dismiss the indictment on the grounds of prosecutorial misconduct, *inter alia,* he indicated his hope that the court of appeals would view the matter differently. (*Id.* at 540–41).

Following the law as he viewed it, the motions were nevertheless denied. The judge also expressed serious displeasure with the unconscionable delay in obtaining the indictment, but found no prejudice therefrom. The judge stated that there was no showing that Elton understood his rights any more completely in the grand jury proceeding than he had understood the warnings by the F.B.I. before his statement was made two years earlier, which warnings Judge Mechem held that Elton did not then understand. Thus there was no showing that Elton understood his various rights, including that of having an attorney to advise him as to whether he should testify before the grand jury. (*Id.* at 543).

Chief Judge Bratton found that the use of the suppressed statement was improper, that from the interpreter's remarks, it was obvious that Elton was "pretty well confused, and in my judgment, understandably somewhat cowed by all of these circumstances," so that the court could not approve of the prosecutorial conduct and procedure before the grand jury, although the judge did not accuse the prosecuting attorney of intentionally improper conduct. (*Id.* at 544–45). The judge said, however, that there was other evidence before the grand jury from which it could find an indictment and that it was not a case where there was nothing before the grand jury except something totally improper; that he supposed that Judge Mechem's findings of fact in the Elton Pino case themselves would have been sufficient for the grand jury to act on

if it wished. Judge Bratton concluded he could not go behind the indictment in the instant case and dismiss it. (*Id.* at 544).

■ The remedy of dismissal of an indictment on such grounds is an extraordinary one. It is applied to insure proper standards of conduct by the prosecution. *See United States v. Thibadeau,* 671 F.2d 75, 77–78 (10th Cir.1982); *United States v. Cederquist,* 641 F.2d 1347, 1352 (9th Cir. 1981) (dismissal may be based on the Fifth Amendment Due Process Clause or upon the court's inherent supervisory powers); *accord, United States v. McKenzie,* 678 F.2d 629, 631 (5th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 450, 74 L.Ed.2d 604 (1982). An indictment may be dismissed for prosecutorial misconduct which is flagrant to the point that there is some significant infringement on the grand jury's ability to exercise independent judgment. *See United States v. Wright,* 667 F.2d 793, 795 (9th Cir.1982); *United States v. Thompson,* 576 F.2d 784, 786 (9th Cir.1978); *United States v. Cady,* 567 F.2d 771, 776 (8th Cir.), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1977).

■ An indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence, or even on the basis of information obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination. *United States v. Calandra,* 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561. The Supreme Court, however, has recognized that there may be a different result where what was transpiring before the grand jury would itself violate a constitutional or statutory privilege. *See United States v. Beery,* 678 F.2d 856, 860 (10th Cir.1982); [9] *United States v. Helstoski,* 635 F.2d 200, 203, 205–06 (3d Cir.1980); *United States v. Nemes,* 555 F.2d 51, 55–56 (2d Cir.1977). In *Beery,* we held that the introduction during grand jury proceedings, of testimony of the defendant immunized by statute, or evi-

---

**9.** In *Calandra,* the Court stated that the grand jury "may not itself violate a valid privilege, whether established by the Constitution, stat-

utes, or the common law." 414 U.S. at 346, 94 S.Ct. at 619.

dence derived by the use of that immunized testimony, in direct violation of the statutory grant of immunity, would require dismissal of the indictment unless it could be shown that such error was harmless beyond a reasonable doubt.

■ We share the deep concern of the trial judge about the use by the prosecution of the suppressed statement in the grand jury proceedings, and the related threats of testimony by the agents to repeat the suppressed statement, and of perjury charges, in view of the dubious status of the trustworthiness of the statement. However, as the trial judge did, we note that there was other evidence, apart from Elton Pino's testimony, indicating that Amos Pino committed a violent attack on Coho. Our record does not include the entire grand jury proceedings. (Defendants' Ex. 1, 2–50). It does, however, contain an accurate quotation by the prosecutor of part of Judge Mechem's findings in Elton's case, clearly implicating Amos Pino.[10] And as noted earlier, at the actual trial of Amos Pino, Elton did not testify and thus no direct effect on the testimony before the trial jury resulted from the conduct in the grand jury proceedings.

We are not persuaded that the circumstances as a whole show such flagrant misconduct that the grand jury was overreached or deceived in some significant way, or that the prosecutor's conduct significantly infringed on the ability of the grand jury to exercise its independent judgment. *United States v. Cedarquist,* 641 F.2d 1347, 1352–54 (9th Cir.1981). We are also not convinced that the circumstances here justify exercise of the court's supervisory power to protect the integrity of the judicial process by dismissing the indictment. Hence we conclude that the conviction should not be reversed on these grounds.

## IV

■ Finally, defendant contended in his initial motion to dismiss the indictment below that New Mexico's jury selection procedures deprived him of his right to a fair and impartial jury, claiming unlawful underrepresentation of Indians on jury panels. (I R. 3).

Defendant and the Government entered into a stipulation before the trial that this issue would be governed by the ultimate resolution in *United States v. Yazzie,* (I R. 25; II R. 4). In *Yazzie,* subsequent to the trial in the instant case, we held that the same New Mexico jury selection procedures challenged here did not deny an Indian his rights under the Sixth and Fourteenth Amendments with respect to equal protection of the laws and under 28 U.S.C. §§ 1861–1863 to juries drawn from a fair cross-section of the community.[11] Dispari-

10. The grand jury had before it the most damaging portions of Judge Mechem's findings in Elton's juvenile proceeding:

    ... James Coho was pulled off the horse by Amos. Elton Pino dismounted his horse and a fight between James Coho and the brothers began. Elton Pino and Amos punched and kicked James Coho.... James Coho was knocked to the ground by one of the blows struck by the brothers. Amos and Elton kept kicking James Coho while he was on the ground. Amos walked about twenty or thirty feet and retrieved a flat rock with protrusions on it and struck James Coho with it on the left side of his head one time. After James Coho was hit with the rock, he rolled over and was still...

    (Defendant's Exhibit 1 at 46–47; I R. 81–82).

    We note that the prosecutor quoted part of the findings as stating that " 'Vance Jake came back the next morning,' and found the body." (Defendant's Exhibit 1 at 47). Actually, the findings stated that "Vance Jake came back the next morning and discovered James Coho in the same spot as he was when Vance had left the previous day. At that time, James Coho was unconscious and making moaning sounds and wiping his face with one of his hands in an involuntary manner." (I R. 82).

    We do not view this discrepancy as serious, however, in the circumstances here where there was no real showing of a controversy as to the cause of death.

11. 28 U.S.C. §§ 1861–1863 deal with the composition of juries in federal district courts. Section 1861 is a declaration of policy regarding jury selection and the fair cross-section requirement. Section 1862 prohibits exclusion from jury service on account of race, color, religion, sex, national origin, or economic status. Section 1863 sets forth a plan for random jury selection.

ties in Indian representation on grand and petit jury venires were not sufficiently gross or marked so as to reveal a substantial underrepresentation of Indians on jury venires under equal protection analysis, nor was the representation of Indians on the panels unfair and unreasonable under fair cross-section requirements. *United States v. Yazzie,* 660 F.2d 422, 427–28 (10th Cir.), *cert. denied,* 455 U.S. 923, 102 S.Ct. 1282, 71 L.Ed.2d 464 (1982). In view of the stipulation of the parties and the finality of the ruling in *Yazzie* adverse to the defendant's position, this last contention lacks merit.

AFFIRMED.