(713 P.2d 967)

No. 57,651

STATE OF KANSAS, *Plaintiff-Appellee*, v. MAX L. POTTS, *Defendant-Appellant.*

—

 Opinion filed February 6, 1986. 

*Charles A. O'Hara*, of O'Hara, O'Hara & Tousley, of Wichita, for the appellant.

*Geary N. Gorup*, assistant district attorney, *Clark V. Owens*, district attorney, and *Robert T. Stephan*, attorney general, for the appellee.

Before MEYER, P.J., REES, J., and FRED S. JACKSON, District Judge, assigned.

JACKSON, J.: The defendant, Max Potts, appeals from his conviction of four counts of selling drugs. He argues on appeal that he was denied due process based on pre-accusation delay and that the sentence imposed under the Habitual Criminal Act constitutes cruel and unusual punishment.

The facts are that Kathleen Dye, a police officer on temporary assignment with the Narcotics Division of the Wichita Police Department, gave her phone number to Mr. Potts on February 3, 1984. Mr. Potts called that number on February 6, 1984, and left a message for Ms. Dye to call him. She returned his call and she asked to buy two preludin tablets or "peaches" (phenmetrazine). She was told to meet him in Central Riverside Park in Wichita.

She met him that night (February 6, 1984) and purchased two peaches for $30.

On February 9, 1984, Ms. Dye phoned a certain number and left a message "Max, call Kathy" and her number. Mr. Potts returned her call within three minutes. She asked to buy eight peaches and Mr. Potts told her to meet him at a gas station at 13th and Hydraulic. This time, she took Detective Miller with her. Mr. Potts and Ms. Dye transacted the buy through their car windows. Ms. Dye paid $120 for the eight pills. These pills were determined to be phenmetrazine.

Ms. Dye next phoned Mr. Potts on March 13, 1984, at the Chateau Lounge in Wichita. She and Detective Miller drove to the club. Inside the club, Mr. Potts asked what she needed and Ms. Dye asked if Mr. Potts had three types of drugs—preludins, ritalins or dilaudids. Mr. Potts replied no, and Ms. Dye then asked if he knew anyone she could contact. Mr. Potts offered to obtain some heroin for which she agreed to pay $80. Mr. Potts and the barmaid, Ms. Byrd, left the club together, and Ms. Byrd returned alone with two balloons. Ms. Dye and Ms. Byrd exchanged money and drugs. Ms. Dye saw Mr. Potts standing outside the club near his car and thanked him.

On March 14, 1984, Ms. Dye phoned Mr. Potts at the club and said she liked the stuff from the night before and that she had a lot of money. The decision had previously been made to arrest Mr. Potts that night. Mr. Potts told her to come to the club. Detective Miller and Ms. Dye went to the club together. When they arrived, Mr. Potts was on the phone. After his call ended, he asked Ms. Dye what she needed and she said she had $500 and wanted what she bought the night before. Mr. Potts said he didn't have that much. Ms. Dye asked him if he knew whom she could contact and Potts said no, that he had been on the phone to somebody but couldn't get it until the next night. Ms. Dye then left Mr. Potts. A few minutes later, Mr. Potts approached Ms. Dye and asked her to come outside alone. Carl Jordan was outside with Mr. Potts and had heroin to sell Ms. Dye. She purchased four balloons for $260, gave the money to Mr. Jordan and then gave the code for the backup officers to arrest Mr. Potts. Mr. Jordan gave Mr. Potts the marked money and, when the arrest took place, Mr. Potts let the money drop from his hands.

The substance in the balloons were chemically proved to be heroin.

Mr. Potts was convicted on August 8, 1984, of two counts of the sale of phenmetrazine and two counts of the sale of heroin.

The presentence investigation report recommended that the maximum sentence on each count run consecutively. The report stated Mr. Potts' criminal activity began 24 years ago; he has a strong pattern of criminal conduct which will continue in the future.

The State moved to impose the Habitual Criminal Act and on October 17, 1984, the court found Mr. Potts had been convicted two or more times of a felony and sentenced Mr. Potts to a period of 15 to 60 years on each charge, the sentences to run consecutively.

Mr. Potts' argument he was denied due process of law is based on two contentions: (1) that the State had probable cause to arrest Mr. Potts after the first drug buy on February 6, 1984, and Mr. Potts' rights were violated when the three additional buys took place; (2) that the pre-accusation delay meets the two-part test of *State v. Royal*, 217 Kan. 197, 202, 535 P.2d 413 (1975).

In *State v. Royal*, 217 Kan. 197, the Kansas Supreme Court discussed the problem of pre-accusation delay and adopted the reasoning of the United States Supreme Court in *United States v. Marion*, 404 U.S. 307, 30 L. Ed. 2d 468, 92 S. Ct. 455 (1971). The court stated:

"The rights of a defendant under the due process clause of the Fifth Amendment are not violated by pre-accusation delay in the absence of a showing that actual prejudice resulted from the delay and that the delay was intentionally designed to gain tactical advantage over the defendant or to harass him." 217 Kan. 197, Syl. ¶ 2.

See also *United States v. Beitscher*, 467 F.2d 269 (10th Cir. 1972); *United States v. Tager*, 481 F.2d 97 (10th Cir. 1973).

In the later case of *United States v. Lovasco*, 431 U.S. 783, 52 L. Ed. 2d 752, 97 S. Ct. 2044 (1977), the Supreme Court of the United States again addressed the practical difficulties which may be encountered in the application of the rules concerning pre-accusation delay. The Court stated:

" 'There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a

quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.'" 431 U.S. at 792 n. 13, quoting *Hoffa v. United States*, 385 U.S. 293, 310, 17 L. Ed. 2d 374, 87 S. Ct. 408 (1966).

"It requires no extended argument to establish that prosecutors do not deviate from 'fundamental conceptions of justice' when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause. It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. . . . From the perspective of potential defendants, requiring prosecutions to commence when probable cause is established is undesirable because it would increase the likelihood of unwarranted charges being filed, and would add to the time during which defendants stand accused but untried. These costs are by no means insubstantial since, as we recognized in *Marion*, a formal accusation may 'interfere with the defendant's liberty, . . . disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.' 404 U.S., at 320. From the perspective of law enforcement officials, a requirement of immediate prosecution upon probable cause is equally unacceptable because it could make obtaining proof of guilt beyond a reasonable doubt impossible by causing potentially fruitful sources of information to evaporate before they are fully exploited. And from the standpoint of the courts, such a requirement is unwise because it would cause scarce resources to be consumed on cases that prove to be insubstantial, or that involve only some of the responsible parties or some of the criminal acts. Thus, no one's interests would be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so." 431 U.S. at 790-92.

In *United States v. Marion*, 404 U.S. at 321, n. 13, the Court stated:

"'Allowing inquiry into when the police could have arrested or when the prosecutor could have charged would raise difficult problems of proof. As one court said, "the Court would be engaged in lengthy hearings in every case to determine whether or not the prosecuting authorities had proceeded diligently or otherwise." [Citation omitted.]'"

In the case at bar, the undercover officer first purchased drugs from the appellant on February 6, 1984, and he was arrested on March 14, 1984. We cannot conclude from the record that this delay of a little more than a month from the date of the first buy to the time of appellant's arrest was prejudicial. It is incumbent upon the appellant to establish that he has suffered actual or substantial prejudice by reason of the delay. It might be that he has been hampered in his effort to mount a defense because of a loss of evidence, memories have dimmed, witnesses have died or documents have been destroyed. The appellant in this case

has failed to demonstrate that he has suffered such actual prejudice and the record does not support his contention that he has been prejudiced by reason of the delay in question here. See *United States v. Marion*, 404 U.S. at 321; *United States v. Lovasco*, 431 U.S. 783; *United States v. Pino*, 708 F.2d 523 (10th Cir. 1983); *United States v. MacClain*, 501 F.2d 1006 (10th Cir. 1974).

With respect to the second part of the two-part test established in *State v. Royal*, 217 Kan. 197, we must next consider whether the delay was purposefully designed to gain some tactical advantage over this appellant. *United States v. MacClain*, 501 F.2d at 1009-10. A delay brought about by a good faith investigation is fundamentally different from a delay designed to gain tactical advantage. *United States v. Lovasco*, 431 U.S. at 795; *Stoner v. Graddick*, 751 F.2d 1535, 1541 (11th Cir. 1985).

The delay in this case resulted in the State's obtaining sufficient evidence to support three additional charges of selling drugs after the initial purchase of drugs from this appellant. Here, it appears that the prejudice complained of is due to the appellant's continuing to sell drugs. There is no showing that the State obtained any tactical advantage at trial by reason of the delay in question.

The record is silent concerning any reason given for the delay. The State argues on appeal there was a good faith reason to continue to investigate after the one sale, to determine who defendant's suppliers were. The State also argues repeated sales help to dispel a possible entrapment defense. Appellant, however, contends he was a "target" and the delay was solely to accumulate charges.

The record reveals each buy is different. The first buy on February 6 was for two pills of phenmetrazine. The second buy on February 9 was for an increased amount, eight pills. Over a month later at the third buy, the undercover agent asked appellant if he had two other different drugs and the appellant replied he did not but he knew someone who had heroin. A buy of $80 worth of heroin then took place. The next night, on the fourth buy, the undercover agent attempted to purchase $500 worth of heroin, but the appellant said he couldn't get that much until the next night. She bought $260 worth of heroin.

We conclude that the record supports the State's argument that

the investigation was continued in order to determine the appellant's suppliers. Each buy was for a greater quantity of drugs and the last two involved significant amounts of heroin. It appears from the record that the undercover agent was attempting to learn the identity of the appellant's suppliers or other persons who might be involved with him in the sale of drugs. On the fourth buy, two other individuals involved with the sale were arrested along with the appellant.

Appellant's final contention is that his sentence to four consecutive terms of 15 to 60 years based on the totality of circumstances was an abuse of judicial discretion and constitutes cruel and unusual punishment.

The transcript reflects the defendant stipulated to the penitentiary packet which contained the certified copies of appellant's prior convictions, including felonies for which appellant was incarcerated in the penitentiary. Appellant, however, opposed the invoking of the Habitual Criminal Act. Appellant argues the presentence investigation was not as complete as it should have been. Appellant argues he is presently employed, is attempting to correct his lifestyle, the crimes charged were not serious, and he can be rehabilitated.

The court found the presentence report complete and also found from the evidence introduced defendant had more than two prior felony convictions. The previous convictions were of a violent nature—first-degree robbery, unlawful possession of a pistol, maiming and wounding, voluntary manslaughter and aggravated battery. The court stated rehabilitation didn't make any sense in light of appellant's past criminal record and the four new convictions.

After stating the above reasons, the court imposed the maximum sentences on each count allowed under the law for a class C felony: 5-20 years. The court then tripled the sentences under K.S.A. 1984 Supp. 21-4504(b) to 15-60 years, and held the four sentences of 15-60 years each are to run consecutively.

The provisions of the Kansas Habitual Criminal Act are constitutional. *State v. Caldrone*, 205 Kan. 828, 473 P.2d 66 (1970), *cert. denied* 401 U.S. 916 (1971). K.S.A. 1984 Supp. 21-4504(b) provides that upon a third or subsequent felony conviction the court *shall* fix a minimum sentence of not less than the greatest nor more than three times the greatest minimum sentence au-

thorized for the particular crime involved and the court *may* fix a maximum sentence of not less than the least nor more than three times the greatest maximum sentence authorized. The enhanced sentences are within the statutory limits applicable to this case. The minimum sentence for a class C felony is 3 to 10 and the maximum is 5 to 20 years.

The court's tripling of the sentence is authorized by the legislature. The record discloses no abuse of discretion by the trial court, nor oppression or prejudice. While stating appellant's arguments not to enhance were well presented, the court remained concerned with the violent nature of appellant's past crimes, his long criminal record, and the improbability of rehabilitation.

Appellant argues the court should apply the proportionality analysis to this sentence to determine whether its length is disproportionate to the extent of his crimes. The proportionality test involves (1) the gravity of the offense and the harshness of the penalty, (2) the sentences imposed on other criminals in the same jurisdiction, and (3) the sentences imposed in other jurisdictions for the same crime. *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978).

It is not necessary to apply the proportionality test, however. The most recent United States Supreme Court case to address the applicability of the proportionality test to a sentence of imprisonment is *Solem v. Helm*, 463 U.S. 277, 77 L. Ed. 2d 637, 103 S. Ct. 3001 (1983) (5-4 decision). The court recognized the great deference a reviewing court should give to the legislature's determination of appropriate punishment and concluded:

"Absent specific authority, it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence; rather, in applying the Eighth Amendment the appellate court decides only whether the sentence under review is within constitutional limits. In view of the substantial deference that must be accorded legislatures and sentencing courts, a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate." 463 U.S. at 290 n. 16.

In this case, the individual sentences imposed were within the statutory limits prescribed by the legislature. We cannot conclude that the sentences were disproportionate to the appellant's crimes. The determination whether separate sentences imposed on the same day should be concurrent or consecutive is discre-

tionary with the trial court. *Burns v. State*, 215 Kan. 497, 500, 524 P.2d 737 (1974); *McCarty v. Hudspeth*, 166 Kan. 476, 480, 201 P.2d 658 (1949); *In re MacLean*, 147 Kan. 678, 681, 78 P.2d 855 (1938).

As a general rule, consecutive sentences imposed on *separate and distinct offenses* will not constitute cruel and unusual punishment. 21 Am. Jur. 2d, Criminal Law § 629; Note, *Disproportionality in Sentences of Imprisonment*, 79 Colum. L. Rev. 1119 (1979); Annot., 33 A.L.R.3d 335.

Here the offenses were for separate and distinct offenses. Each offense occurred on a different night and involved a different amount of drugs, although the sales were with the same undercover officer. The trial judge orally stated his reasons for imposing the maximum sentences and the Habitual Criminal Act as required by *State v. Buckner*, 223 Kan. 138, 574 P.2d 918 (1977).

For the foregoing reasons, we conclude that the contentions raised by the appellant in this appeal are without merit and the judgment of the trial court is affirmed.