UNITED STATES of America, Plaintiff,

v.

Lowell G. ANDERSON, et al., Defendants.

Crim. Nos. CR83010, CR83013.

United States District Court, D. Wyoming.

Oct. 20, 1983.

---

Francis Leland Pico, Asst. U.S. Atty., Cheyenne, Wy., for plaintiff.

Joseph Saint-Veltri, Denver, Colo., for defendant Lowell Anderson.

Stephen M. Munsinger, Denver, Colo., for defendant Carolyn Anderson.

Mike DeGeurin, Houston, Tex., for defendant Arthur P. Tranakos.

Rod W. Snow, Denver, Colo., for defendant William Pilgrim.

Donald Bearnson, Arvada, Colo., Donald Perry, Lakewood, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

KANE,* District Judge.

This matter comes before me on various motions of the defendants, Lowell Anderson, Carolyn Anderson, William Pilgrim, Donald Bearnson and Arthur Tranakos, to dismiss or quash the indictment. A total of eight defendants are charged with conspiracy to defraud the government and related offenses, including income tax evasion and obstruction of justice, in violation of 18 U.S.C. § 371, 26 U.S.C. § 7201, 26 U.S.C. § 7206(2) and 18 U.S.C. § 1503. The indictment arose out of the promotion and sale of so called "common law trusts." These trusts are alleged to have consisted of a system of trusts established both in the United States and overseas. The purchasers of the trusts placed various assets in them, in transactions that the government alleges were without any economic substance and which were designed to evade tax liability. The trusts are alleged to have been shams in that the grantors never actually relinquished control of the assets placed in them. I will discuss the various motions individually.

## I. MOTION TO QUASH INDICTMENT

In this motion, the defendants claim that violations of the sixth amendment and the Federal Grand Jury Service and Selection Act of 1968,[1] 28 U.S.C. § 1861 *et seq.*, require me to quash the indictment of February 24, 1983. To put the motion in proper perspective, a brief description of the district of Wyoming's jury selection plan is essential.

In response to the Act of 1968, the district court formulated a plan for the ran-

---

* Sitting by designation.

1. The statutory "fair cross-section of the community" standard and the constitutional "rea-sonably representative" standard are "functional equivalent[s]." *United States v. Test,* 550 F.2d 577, 584, (10th Cir.1976).

dom selection of grand and petit jurors. The plan was approved by the 10th Circuit Judicial Council on September 18, 1968.[2] The plan divided the state and district into five divisions for jury selection purposes, Cheyenne, Casper, Sheridan, Evanston and Lander, after the five principal cities in those divisions. As originally passed, grand jurors were randomly selected from the qualified jury wheels of each of the divisions and placed into a pool, from which the grand jury was selected.

By order of April 30, 1976, the plan was modified to read:

In order to ensure the more efficient and regular use of the grand jury, and to ensure that grand juries may be summoned at such times as the public interest requires without delay, unnecessary expenses or undue burden upon the citizens of the district, which delay, expense and burden necessarily result because of the great distances between cities within the district, and because all criminal trials are conducted at Cheyenne, the selection of jurors for the grand jury shall be taken at random from the Qualified Jury Wheel of the aforesaid Cheyenne Division of the district. The persons so chosen shall then be summoned as hereinbefore provided and shall constitute the grand jury array from which the grand jury shall be selected.

This modification, at issue here, was approved by the judicial council on May 19, 1976.[3] The practical effect of the plan is to exempt all persons living in 19 of Wyoming's 23 counties from grand jury service.

**2.** This review is required by 18 U.S.C. § 1863(a). It was hoped that

the involvement of the reviewing panels in the approval of jury selection plans [would], by subjecting the plan to the deliberation of a second body, increase the likelihood that the plan will comply with the statutory provisions, and thereby reduce the likelihood of challenges.

House Rep. No. 1076, 90th Cong.2d Sess. (1968), reprinted in 1968 U.S.Code, Cong. & Admin. News, 1792, 1799.

**3.** This modification, like the four others which came before and after it, was incorporated, with a slight modification, into one single document

The parties have stipulated that the grand jury has never sat anywhere but Cheyenne.

The 1968 act permits groups of persons or occupational classes to be excused from jury service "on individual request ... [where] jury service by such class or group would entail undue hardship or extreme inconvenience to the members thereof ...." 28 U.S.C. § 1863(b)(5). The phrase "undue hardship or extreme inconvenience" is in turn defined

as a basis for excuse from immediate jury service under § 1866(c)(1) of this chapter [to] mean great distance, either in miles or travel-time, from the place of holding court....

28 U.S.C. § 1869(j).

As I understand the defendants' argument, they say it would be permissible for the plan to permit individual excuses for hardship,[4] but that the wholesale exclusion of persons in 19 counties violates the act's policy of "juries selected at random from a fair cross section of the community...." 28 U.S.C. § 1861.

I disagree. Section 1861 mandates randomly selected juries from a fair cross section of the community "in the district *or division* wherein the court convenes." (Emphasis added.) As defined in § 1869(e), "division" includes:

in judicial districts where there are no statutory divisions, such counties, parishes, or similar political subdivisions surrounding the places where court is held *as the district court plan shall determine: Provided,* That each county, par-

by Chief Judge Brimmer on February 12, 1981, and approved March 17, 1981 by the 10th Circuit. The clause, "and because all criminal trials are conducted at Cheyenne," was deleted in the 1981 compilation.

**4.** Plans in the past have been upheld for hardship distances of 150 miles, *United States v. Olson,* 576 F.2d 1267 (8th Cir.1978); 70 miles, *United States v. Lewis,* 504 F.2d 92 (6th Cir. 1974); 40 miles, *United States v. Valentine,* 472 F.2d 164 (9th Cir.1973); and 50 miles, *United States v. Gruberg,* 493 F.Supp. 234 (S.D.N.Y. 1979). All these plans were under earlier versions of the Jury Selection and Service Act.

ish, or similar political subdivision shall be included in some such division.

(Emphasis added.) The Wyoming judicial district has no statutory divisions. 28 U.S.C. § 131. Accordingly, the Wyoming divisions are those where court is held under the district plan, so long as each county is included in such a division. By statute, 28 U.S.C. § 131, and under the plan, court is held in Casper, Cheyenne, Evanston, Lander and Sheridan. All of the 23 counties in Wyoming feed jurors into the master jury wheel for each of the divisions. None are excluded.

Although this precise issue is one of first impression, other district courts have upheld their plans as they pertain to petit juries against similar challenges. *Jeffers v. United States*, 451 F.Supp. 1338, 1347 (N.D.Ind.1978) ("A defendant may be indicted by a grand jury drawn from one division of the district and tried by a jury drawn from another division, without offending constitutional or statutory standards"); *United States v. Smith*, 463 F.Supp. 680, 685 (E.D.Wisc.1979) ("Likewise, a petit jury may be drawn constitutionally from only one division and not the whole district."); (*Unites States v. Raineri*, 521 F.Supp. 30, 38 (W.D.Wisc.1980) *aff'd*, 670 F.2d 702 (7th Cir.1982) ("Defendant has no constitutional or statutory right to a jury drawn from throughout the district.")

An argument similar to the one made here was raised in *United States v. Test*, 550 F.2d 577, 594 (10th Cir.1976). There, the court said:

'The fourth ground for attack is that the plan effectively excludes from petit jury service all persons who reside in the Pueblo and Grand Junction divisions, because the vast majority of the trials in this district are held in the Denver division. But the partitioning of a district into jury divisions is sanctioned by the statute, and ... is clearly not unconstitutional, absent evidence that some cognizable group has been systematically excluded by "gerrymandering" the division lines.'

A further problem with the defendants' argument is suggested by a footnote in the *Test* opinion. In its discussion of cognizable and distinctive groups, the court quoted from *Hernandez v. Texas*, 347 U.S. 475, 478, 74 S.Ct. 667, 670, 98 L.Ed. 866 (1953):

[O]ther differences from the community norm may define other groups which need the same protection. *Whether such a group exists within a community is a question of fact.* When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated.

550 F.2d at 585 n. 6. (emphasis in original). *See also United States v. Foxworth*, 599 F.2d 1, 4 (1st Cir.1979), *United States v. Butera*, 420 F.2d 564 (1st Cir.1970). Here, the defendants allege that the Cheyenne division has a higher percentage of federal government employees than the other divisions. This may be true. The defendants have not however, come forward to show either that the population of the Cheyenne division is somehow thereby biased or that the population of the other 19 counties constitutes a distinct or cognizable group within the meaning of *United States v. Test, supra.*

Mere geographical imbalance, absent evidence that an identifiable and cognizable segment of the community has been systematically excluded or underrepresented by reason of such imbalance, does not violate the statutory and constitutional requirement that the jury represent a 'fair cross-section "of the community." '

550 F.2d at 581–2 n. 4. The motion to dismiss for failure to comply with the Grand Jury Selection and Service Act of 1968 is therefore denied.

## II. MOTION TO DISMISS COUNT I

■ Defendants Tranakos, Pilgrim, Bearnson and Lowell and Carolyn Anderson have moved to dismiss Count I of the indictment on the ground that it fails to allege a specific statutory offense as the

object of the conspiracy. The government responds that 18 U.S.C. § 371 authorizes prosecution for a conspiracy whose sole object is to defraud the United States, and not the violation of any other criminal statute. While the defendants assert correctly that when the government proceeds under the extremely broad "conspiracy to defraud" branch of § 371, the prosecution must be scrutinized carefully, the procedure is not prohibited. *U.S. v. Rosenblatt,* 554 F.2d 36 (2nd Cir.1977). The government must be careful to "plead and prove an agreement with respect to the essential nature of the alleged fraud." 554 F.2d at 42. The sections of Count I entitled "Object of the Conspiracy," "Background" and "Manner and Means of Conspiracy," however, plead such an agreement and, in conjunction with the overt acts, notify the defendants of the nature of the charge against them.

▇ Count I is not fatally defective. Its language is, however, broad and general and subject to the careful scrutiny required by *Rosenblatt, supra.* Since the defendants Bearnson and Carolyn Anderson have made motions for Bills of Particulars, and the government states that it has already begun work on a detailed proffer of evidence, the government could apprise the defendants of the ambit of the conspiracy with which they are charged. The government's proffer could also address Counts IX–XI of the indictment, which charges Lowell Anderson, Arthur Tranakos, and William Pilgrim with obstruction of justice. Those counts fail to state the essential facts regarding the means of obstruction. Defendant Tranakos' motion to dismiss Count XI is therefore denied without prejudice.

▇ Defendants Pilgrim and Lowell and Carolyn Anderson also argue that the conspiracy count is improperly plead since the Internal Revenue Code itself provides for prosecution of inchoate offenses and offenses involving combinations of individuals. 26 U.S.C. §§ 7203 & 7206. They argue that they should be charged only under those provisions. They further argue that, since the Internal Revenue Code does not include a specific conspiracy provision of its own, congress intended not to define a criminal conspiracy involving tax fraud. Because of the facial explicitness of the "conspiracy to defraud" branch of 18 U.S.C. § 371, I am unpersuaded by the defendants' speculative interpretation of congressional intent in Title 26. Nor am I persuaded that the indictment charges numerous conspiracies in one count, as Carolyn Anderson suggests. Rather, it alleges one agreement with a broad object and numerous acts to accomplish that object. Such a charge is not duplicitous. The motion of defendant to dismiss Count I of the indictment is accordingly denied.

### III. MOTION TO DISMISS COUNTS IV–VI

▇ Defendant Carolyn Anderson has also moved to have Counts IV, V and VI dismissed on the grounds that they are duplicitous, and that they do not contain all the elements of the offense charged. The defendant claims that these deficiencies result from the indictment's failure to allege that she had any taxable income in the years she is charged with attempted tax evasion. Anderson asserts that such an allegation is essential to the charge. The government's response is that Carolyn Anderson is charged only with attempting to evade payment of her husband's taxes for the relevant years. A person may be charged with and convicted of attempting to evade taxes owed only by another. *Tinkoff v. United States,* 86 F.2d 868 (7th Cir.), *cert. denied,* 301 U.S. 689, 57 S.Ct. 795, 81 L.Ed. 1346 (1936). The fact that the indictment does not allege that Carolyn Anderson had taxable income in the years in question does not render the charge insufficient. The government asserts in addition that Carolyn Anderson is charged only under 26 U.S.C. § 7201, thereby negating her argument that Counts IV, V and VI each duplicitously charges her under sections 7203 and 7206 as well. Counts IV, V and VI are therefore neither insufficient nor duplicitous.

## IV. MOTION TO DISMISS COUNT X

■ Defendant Pilgrim has moved to dismiss Count X on the ground that since he was imprisoned for contempt of court during the grand jury investigation, under facts identical to those here, that the present prosecution is barred by the principle of double jeopardy. Pilgrim was jailed when he failed to produce documents in response to grand jury subpoena. Mr. Pilgrim concedes that he was imprisoned under the civil contempt statute but argues that the punishment was punitive and not remedial since it had a definite term. Defendant's own brief, however, discloses that the reason the term was definite was that he was released when the grand jury's term expired. This is fully consistent with civil contempt. 28 U.S.C. § 1826. While the defendant did not obtain his own release by complying with the court order in question, his release by reason of the expiration of the grand jury term does not convert the civil contempt to criminal. The double jeopardy bar does not apply to civil contempt. *In re Grand Jury Proceedings, Harold O. Horak,* 625 F.2d 767 (8th Cir. 1980), citing *Shillitani v. United States,* 384 U.S. 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966). The defendant also claims he was imprisoned for two days on a separate occasion under the same facts, but produces no evidence in support of his contention that this imprisonment also was punitive. Especially in view of his concession that he was cited under the civil contempt statute, and the circumstances surrounding the imprisonment previously discussed, the defendant has failed to show that the two day imprisonment was not civil.

## V. MOTION TO DISMISS FOR GOVERNMENTAL MISCONDUCT

■ The Tenth Circuit Court of Appeals has recently articulated the standard to be applied in cases where dismissal of an indictment is sought because of prosecutorial misconduct:

> An indictment may be dismissed for prosecutorial misconduct which is flagrant to the point that there is some significant infringement on the grand jury's ability to exercise independent judgment.

*United States v. Pino,* 708 F.2d 523, 530 (10th Cir.1983). While the remedy of dismissal is extraordinary, it may be used "to insure proper standards of conduct by the prosecution." 708 F.2d at 530. District courts are also empowered to dismiss indictments because of inherent supervisory powers which protect the integrity of the judicial system. 708 F.2d at 531. Isolated errors and improprieties do not require dismissal of the indictment. It is only when the government engages in deliberate conduct which interferes with the grand jury's independent function or damages the integrity of the judicial process that the remedy of dismissal becomes necessary. Because I find that the government engaged in a pattern of conduct calculated to infringe the grand jury's ability to exercise independent judgment, the indictments must be dismissed.

■ This is not a case of isolated errors or improprieties. It is likewise not a case where the prosecutors engaged in outrageous violations of the canons of ethics. *See, United States v. Gold,* 470 F.Supp. 1336 (N.D.Ill.1979). Rather, it is a case in which the government ignored the important constitutional distinctions between grand jury, prosecutor and law enforcement agency. In its presentation of evidence and its conduct before the grand jury, the government breached its duty to insure that the grand jury exercise independent judgment and thereby turned the grand jury into a mere tool of the prosecution. The grand jury is more than a symbol of the limitations the constitution places on the government's power. When the government usurps the grand jury and destroys its independence so that it looks and acts like an arm of the prosecution, the very essence of a government of limited powers is destroyed. *See, United States v. Dionisio,* 410 U.S. 1, 17, 93 S.Ct. 764, 773, 35 L.Ed.2d 67 (1973); *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

■ By far the most serious act in the pattern of governmental misconduct was the use of undercover investigators to infiltrate the defense camp, and the involvement of the grand jury in that infiltration. It is important to note here that the use of these agents did not violate the defendants' sixth and fifth amendment rights, because it took place before their indictment. *United States v. Mandujano*, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976). Rather, it is the effect that the grand jury's involvement in this covert intelligence operation had on its ability to function independently that prejudiced the defendants. The infiltration, and the manner of its presentation to the grand jury, graphically demonstrate the collapse of the independent functioning of the grand jury, by the U.S. Attorney and investigating agents as well.

Undercover agent Craig Tucker testified before the grand jury that he and at least one other agent infiltrated Lowell Anderson's organization. Indeed, it appears that Tucker was subpoenaed before the grand jury by his undercover name in order to solidify his cover. (Testimony of Tucker, 6/17/82 p. 1.) He testified that he used questions prepared by the U.S. Attorney's office to induce defendants Anderson and Tranakos to discuss both their business ventures and the ongoing grand jury proceedings. (Tucker 6/18/82 p. 23.) It is clear from Tucker's testimony that he knew Tranakos was Anderson's lawyer. (Tucker 6/18/82 p. 26.) The U.S. Attorney specifically questioned Tucker about legal strategy and defenses Anderson and Tranakos discussed using in the event of an indictment. Tucker testified that he and another agent were able to gain this information by using a "good-guy/bad-guy routine with Lowell [Anderson] and Art Tranakos." (Tucker 6/18/82 p. 23.) Members of the grand jury also asked Tucker questions about how he was going to maintain his cover. (Tucker 6/17/82 p. 15–16.) Referring to Anderson and the other targets and witnesses, he said he would be able to "buffalo those baboons."

■ The questioning about a target's legal strategy in front of the grand jury encroached upon the grand jury's independence. It was not evidence for the grand jury to evaluate in deciding whether or not a prosecution was warranted, but rather a seductive ploy to inveigle the grand jury into a prosecution that was already under way. This misconduct was compounded by the U.S. Attorney instructing the undercover agent in front of the grand jury that

> the grand jury would like you to maintain your cover with regard to this aspect ... and attempt to develop a sufficient amount of probable cause ... in order to obtain a search warrant for [Lowell Anderson's] offices.

(Tucker 6/18/82 p. 37.) The grand jury's function is to decide whether there is probable cause to prosecute. When the government suggests that a law enforcement officer *develop sufficient probable cause* for a search warrant on the grand jury's behalf, without any warning that this is not probable cause to prosecute, the government encroaches upon the jury's independence. A grand jury that becomes intimately involved in planning an undercover agent's activities and maintaining his cover is no longer standing between the prosecutor and the citizenry as an independent evaluator of evidence; it becomes a cabal.

■ The defendants' motion to dismiss also charges that the government violated grand jury secrecy in a number of ways. Rule 6(e), F.R.Crim.P. It is well settled that the remedy for such secrecy violations is not dismissal of the indictment but contempt. *United States v. Dunham Concrete Products, Inc.*, 475 F.2d 1241 (5th Cir.), *cert. denied*, 414 U.S. 832, 94 S.Ct. 65, 38 L.Ed.2d 66 (1973). Most of the instances the defendants cite are so minor that they do not warrant a contempt citation, let alone dismissal of the indictment. One instance, however, glitters as a piece in the pattern of governmental misconduct that abrogated the grand jury's independence.

■ The government concedes that materials "eventually brought before the grand jury" were reviewed by its expert

witness, Professor Neal Harl, who testified regarding trust law. The Tenth Circuit has ruled that the disclosure to non-governmental personnel of grand jury materials, so that that person can aid in the grand jury investigation, is a violation of rule 6(e) that requires a new trial. *United States v. Tager,* 638 F.2d 167 (10th Cir.1980). The district court opinion in *Tager,* 506 F.Supp. 707 (D.C.Kan.1979), which the Tenth Circuit endorsed, confined the meaning of "government personnel," for purposes of rule 6(e), to members of governmental agencies. The district court specifically rejected the inclusion of individual contract employees in that term. 506 F.Supp. at 716–18. The court reached that confining interpretation only after a thorough investigation and analysis of the legislative history of the rule.

The rule violation presents an obvious danger in this case. The grand jury may not have undertaken its own independent evaluation of the evidence only it had a right to hear, once its members had heard the evaluation and conclusions of an expert. Professor Harl testified to such conclusions in front of the grand jury. (Testimony of Neal Harl p. 4–6.) Presentation of that testimony, in violation of rule 6(e), significantly infringed upon the grand jury's ability to exercise independent judgment. That is not to say that every use of an expert before a grand jury is impermissible or that every secrecy violation warrants dismissal of the indictment. Where, however, the government reveals grand jury materials to an expert who is not governmental personnel and introduces his evaluation and conclusions regarding those materials to the grand jury, an encroachment upon the grand jury's independence has occurred. In this case that encroachment is part of a mosaic of governmental actions calculated to assimilate the grand jury's independence. By introducing the professor's evaluation and conclusions the government invited the grand jury to abjure its own judgment and submit to the analysis of the government's paid expert.

■ Another piece of the pattern of government conduct that impaired the grand jury's ability to act independently was the extensive use of law enforcement officers as "special agents of the grand jury." The grand jury transcripts I have read do not reveal how this pooh-bah office was conferred upon the agents involved. Nonetheless, various government investigative agents described themselves as "grand jury agents" during the course of interviews of potential grand jury witnesses. In these instances they identified themselves with credentials from the IRS but then hastened to explain in Mikado fashion that they were not there on behalf of the agency but on behalf of the grand jury and the U.S. Attorney. At least one agent took it upon himself to grant some sort of informal immunity to a witness by telling her that since she was not a target that her "fifth amendment rights are not involved." (Interview of Marge Brock by Robert Stellmacher p. 2) I will discuss the subject of informal immunity in greater detail below.

■ The most important function of a grand jury is to stand between the prosecuting authorities and the suspect as an unbiased evaluator of evidence. *Dionisio, supra,* 410 U.S. at 16, 93 S.Ct. at 772. That function cannot be maintained or understood by society when citizens are confronted by law enforcement agents who claim to be alter egos of the grand jury. There is a world of difference in a society of limited government between being subpoenaed to testify in confidence before a grand jury of one's fellow citizens and being interrogated in one's home by a law enforcement officer who claims not to be a law enforcement officer at the moment. A grand jury that has become identified in the eyes of lay witnesses before it with law enforcement agencies is not functioning independently of the prosecution. Such identification can only undermine public confidence that the grand jury is performing its constitutional function to check the power of the government. It is well within a district court's supervisory powers to insure that the grand jury's integrity as an

independent body is not destroyed in the public eye. *United States v. Pino*, 708 F.2d at 531. Indeed, one would think that the entire issue had been finally resolved at Runnymede in 1215 A.D.

The government cites *United States v. International Paper Co.*, 457 F.Supp. 571 (S.D.Tex.1978) in support of its argument that courts have sanctioned the use of the kind of interviews on behalf of the grand jury conducted in this case. The holding in that case, however, rests squarely on the determination that the interviews conducted were not grand jury proceedings and were therefore not fatally contaminated by the presence of unauthorized individuals. 457 F.Supp. at 574. The challenge here is not based on the presence of unauthorized personnel at grand jury proceedings. There is also no indication that the interviewers in *International Paper* purported to be "grand jury agents." Rather, when the interview was later to be presented to the grand jury the witness was sworn, the interview was recorded by tape or reporter, the witness was assured of the secrecy of the interview and that he or she had the right to have an attorney present. While I am not in full agreement with the district court in Texas that this process did not constitute grand jury abuse, it is a very different process from the one involved here.

A discussion of the use of "grand jury agents" also occurs in *United States v. Cosby*, 601 F.2d 754 (5th Cir.1979). In a footnote the *Cosby* court cited "cases where the use of third parties to assist grand juries has been considered and approved." 601 F.2d at 757–58, n. 6. The court *assumed without deciding* that the use of grand jury agents was a proper practice and went on to reverse the case on other grounds. Thus, there is no thorough analysis of the problems posed by the extensive use of "grand jury agents" and of the manner in which they were used in this case. The conduct of those agents here is a link in the chain of government behavior that impaired the grand jury's independence and undermined its integrity.

The government, in this case, made extensive use of informal or "pocket" immunity. This is putative immunity granted to a witness by letter or oral representation of the prosecutor rather than ordered by a judge after satisfaction of the procedures of 18 U.S.C. §§ 6002 and 6003. Such immunity poses serious problems since it circumvents the statute and leaves an inadequate record of the scope of the immunity granted. *See, United States v. Quatermain, Drax*, 613 F.2d 38 (3rd Cir. 1980). The procedures established by congress in 18 U.S.C. §§ 6002 and 6003 clearly indicate an intent to formalize, standardize and limit the use of immunity. The statute requires approval of a senior Justice Department official as well as application to and order of a United States District Court Judge before immunity is conferred. The procedure leaves no doubt as to the accomplishment of the grant, the particularized need of the witness and the scope of the immunization. It also leaves for congress and the public a complete and definite record of the frequency, efficacy and reasons for the use of immunity. Informal immunity, apparently in widespread use by the Justice Department, accomplishes none of those goals. It is a damnable practice. No notice need be given to senior Justice Department officials or to a judge. The only record, if any, is a letter by the U.S. Attorney or a transcript of an oral representation, if it was made on the record. Such informality has resulted in confusion over witnesses rights in the past, *Quatermain, Drax, supra*, 613 F.2d 38, and lends itself to excessive use of unchecked discretion. While the immunity grant is always a matter of prosecutorial discretion, the procedures of §§ 6002 and 6003 subject it to the light of public, congressional and judicial scrutiny and insure that it is not invoked or revoked arbitrarily or capriciously.

The extensive use of informal immunity to compel testimony in this case is part of the pattern of conduct on the part of the government that breached the integrity of the grand jury system. In addition

to the purposes I discussed above, the procedures mandated by 18 U.S.C. §§ 6002 and 6003 are recognition that the important fifth amendment right involved makes the decision to grant immunity and thus compel testimony very different from the ordinary governmental decision not to prosecute. A decision not to prosecute an individual does not necessarily remove that individual's right against self-incrimination, as a grant of immunity does. The incessant use of informal immunity exhibits a disregard for that distinction and for the important constitutional rights involved.[5] The involuntary removal of an individual's fifth amendment right should be undertaken with the strictest regard for the relevant dictates of congress. Nothing in §§ 6002 and 6003 contemplates compelling a witness's testimony merely on the word of an assistant U.S. Attorney. The practice of compelling testimony by having an IRS agent make an oral representation of immunity on behalf of the grand jury is even further removed from the mandate and spirit of the statute. Such a lawless procedure, like the use of law enforcement officers as "special grand jury agents" cannot help but destroy the public perception of the grand jury as an independent democratic institution protecting the constitutional rights of individuals and checking the prosecutorial power of the federal government.

CONCLUSION

The manner in which the government conducted itself during the course of the grand jury proceedings which resulted in the indictments in this case obfuscated the important constitutional distinctions between prosecutor, law enforcement investigator and grand jury. The disregard of those distinctions due to deliberate conduct on the part of the government significantly impaired the grand jury's ability to exercise independent judgment. The government's

involvement of the grand jury in the undercover infiltration of the defendants' organization and legal consultations, its violation of Rule 6(e) by using an expert to evaluate secret evidence and its use of "grand jury agents" and informal immunity all combined to encroach upon the grand jury's independence and undermine the integrity of the judicial process.

IT IS HEREBY ORDERED:

That the motions to quash the indictment, to dismiss Count I, to dismiss counts IV–VI and to dismiss count X are denied; and

The motion to dismiss for governmental misconduct is granted.

---

5. In *United States v. Librach*, 536 F.2d 1228 (8th Cir.1976) the Eighth Circuit ruled that the use of informal immunity is not illegal. Its holding rested on the proposition that an agreement not to prosecute is entirely within the government's

discretion and recording it in a letter does not render it illegal. Because the court's reasoning fails to distinguish between deciding not to prosecute and compelling testimony, I find it unpersuasive.