UNITED STATES of America, Plaintiff,

v.

Donald K. TURNER, Defendant.

Crim. A. No. 85–CR–98.

United States District Court,
D. Colorado.

Oct. 23, 1985.

Thomas O'Rourke, Asst. U.S. Atty., Denver, Colo., for plaintiff.

Brian Holland, Asst. Federal Public Defender, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

On March 19, 1985, a grand jury of the District of Colorado returned an indictment charging defendant, Donald Turner, with two counts of tax evasion, 26 U.S.C. § 7201, and one count of making a false statement in violation of 18 U.S.C. § 1001. This matter is now before me on defendant's motion to dismiss the indictment for prosecutorial misconduct. It is defendant's

position that the numerous instances of prosecutorial misconduct which he alleges in support of this motion require dismissal of the indictment. Although I have discussed this remedy of dismissal at length in *United States v. Anderson*, 577 F.Supp. 223 (D.Colo.1983) and *United States v. Kilpatrick*, 594 F.Supp. 1324 (D.Colo.1984), the instant case presents the opportunity to amplify those decisions.

## I.

■ The power to dismiss an indictment stems primarily from the court's inherent supervisory powers, although a dismissal may also be based on constitutional grounds. *See United States v. Chanen*, 549 F.2d 1306, 1309 (9th Cir.), *cert. denied*, 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977); *United States v. Samango*, 607 F.2d 877, 881 (9th Cir.1979); *United States v. Cedarquist*, 641 F.2d 1347, 1352 (9th Cir.1981); *Anderson*, 577 F.Supp. 223, 230; *Kilpatrick*, 594 F.Supp. 1324, 1351–52. The purpose of this remedy is to " 'protect the integrity of the judicial process,' ... particularly the function of the grand jury, from unfair or improper prosecutorial conduct." *Chanen*, 549 F.2d 1306, 1309 (citations and footnotes omitted). Thus, the remedy of dismissal may be used "to insure proper standards of conduct by the prosecution." *United States v. Pino*, 708 F.2d 523, 530 (10th Cir.1983).

■ This remedy is rarely invoked, however, because it is deemed extraordinary. *Pino*, 708 F.2d 523, 530; *Kilpatrick*, 594 F.Supp. 1324, 1351. Courts are reluctant to encroach on the constitutionally based independence of the prosecutor and the grand jury. *Samango*, 607 F.2d 877, 881. "It is only when the government engages in deliberate conduct which interferes with the grand jury's independent function or damages the integrity of the judicial process that the remedy of dismissal becomes necessary." *Kilpatrick*, 594 F.Supp. 1324, 1352. Such misconduct must not only be "flagrant to the point that there is some significant infringement on the grand jury's ability to exercise independent judg-

ment," *Pino*, 708 F.2d 523, 530, the facts of those cases where dismissal has been granted indicate that the prosecutorial misconduct must actually *usurp* the grand jury and *destroy* its independence. *See Kilpatrick*, 594 F.Supp. 1324; *Samango*, 607 F.2d 877; *Anderson*, 577 F.Supp. 223; *United States v. Hogan*, 712 F.2d 757 (2d Cir.1983). Thus, the remedy of dismissal can be invoked only under the most egregious circumstances.

■ In ruling upon a motion to dismiss the indictment, a court must examine the facts surrounding each alleged instance of prosecutorial misconduct. Some violations, standing alone, may require dismissal. Others, while not singularly requiring dismissal, when combined with one another may establish a pattern of misconduct rising to that level where government dictation is substituted for the grand jury's authority and autonomy. *See Kilpatrick*, 594 F.Supp. 1324, 1352. Isolated errors and improprieties, however, do not require dismissal of the indictment. *Anderson*, 577 F.Supp. 223, 230; *Kilpatrick*, 594 F.Supp. 1324, 1352.

## II.

Bearing in mind these principles, I now turn to the specific instances of alleged prosecutorial misconduct in the instant case. Relying primarily on *Anderson* and *Kilpatrick*, defendant alleges that the prosecutors improperly: 1) used grand jury agents, 2) granted "pocket" or "informal" immunity, 3) allowed an IRS investigator to mischaracterize the evidence before the grand jury, 4) introduced extraneous prejudicial information, 5) testified before the grand jury through the use of leading questions and by directly answering jurors' questions, 6) placed a government agent in the defense camp in violation of defendant's Fourth Amendment rights, 7) elicited testimony from defendant's wife in violation of his marital privilege, and 8) delayed return of the indictment. Each of these alleged instances of misconduct will be examined separately in order to determine if any violation, standing alone, would require

dismissal. If none would independently require dismissal of the indictment, then I shall consider their cumulative effect in determining whether the grand jury's independent role in returning this indictment was usurped.

## A. Grand Jury Agents

Defendant first asserts that the prosecutors in the instant case, as in *Kilpatrick*, improperly used grand jury "agents". In *Kilpatrick*, I held that the use of grand jury "agents" in the circumstances of that case violated Fed.R.Crim.P. 6(d) and required dismissal of the indictment. 594 F.Supp. 1324, 1344. There, prosecutors had administered oaths to IRS investigators, purportedly swearing them in as "agents of the grand jury". 594 F.Supp. 1324, 1328. The prosecutors misled the grand jury as to the appropriate role of these investigators and urged the grand jury members to rely upon them as their "agents". 594 F.Supp. 1324, 1328–29. When the investigators appeared as witnesses, the government attorney reiterated that they were appearing as "agents of the grand jury". 594 F.Supp. 1324, 1329. Further, the prosecutors instructed the investigators to inform witnesses that they were assisting a grand jury investigation when they went to interview the witnesses. 594 F.Supp. 1324, 1329. Finally, contrary to the role of the investigators described to the grand jury by the prosecutors, the IRS agents themselves did not view their role as agents of the grand jury. Rather, they viewed their role and conducted their investigation as agents of the Department of Justice, primarily assisting the prosecutors. 594 F.Supp. 1324, 1329. In holding that these practices violated Rule 6(d), I found that they constituted "improper intrusion[s] into the elusive and independent province of the grand jury by government attorneys and investigators." 594 F.Supp. 1324, 1344.

In the present case, defendant contends that the IRS investigators misled at least three witnesses by failing to identify themselves as special agents of the IRS and creating the impression that they were "agents" of the grand jury. Two witnesses testified at a hearing on this motion that, although the IRS investigators who interviewed them displayed a badge or an identification card, they did not identify themselves as IRS investigators. Another witness, Steve Wagner, testified before the grand jury that two men came to his office to interview him in connection with this case and that he was confused as to their role in this matter:

THE WITNESS: There is a confusion a bit in my mind about being under investigation by the Grand Jury or by the IRS.

MR. THORNHILL: So Mr.—

THE WITNESS: Now, I'll tell you where that comes from is because Batson and Lovell came out to my office and for fifteen minutes tried to lead me to believe they were with the Grand Jury. The first time—

MR. THORNHILL: I can advise you that Mr. Batson and Lovell are acting as assistants to this Grand Jury. They are assisting the United States Attorney's Office in the conduct of this Grand Jury. They are—and I'm sure that they told you this—

THE WITNESS: After about fifteen minutes. The first thing they told me was they were with the Grand Jury.

MR. THORNHILL: They are assisting the—

THE WITNESS: Well, that isn't what they said.

MR. THORNHILL: Well, all right, fine.

THE WITNESS: No, they led me to believe—and I was quite upset about this—that they—they said, "Well, we're with the Grand Jury." I says—this was the first time I had met them. I didn't know who they were or who they were with. And I said, "Oh, are you members of the Grand Jury?" "No, we are not members of the Grand Jury. We are with them conducting an investigation." I said, "Well, who do you work for?" "Well, we are working for the Grand Jury." And I said, "Well, could I see some iden-

tification?" And which one is the black man—

MR. THORNHILL: Batson.

THE WITNESS: Batson handed me a card that says Special Investigation or—

MR. THORNHILL: Special Agent, Criminal Investigation?

THE WITNESS: Yeah, IRS. I looked at the card and I says, "Oh, you're with the IRS?" "Well, yeah, we're with the IRS, but we're working for the Grand Jury." And this went on for fifteen minutes. And I said, "Well, why didn't you just come and tell me you were with the IRS?"

MR. THORNHILL: These men are employed by the Internal Revenue Service as special agents attached to the Criminal Investigation Division.

THE WITNESS: Well, I understand now.

\* \* \* \* \* \*

THE WITNESS: ... I was a little perturbed that they would come in and present themselves as—you know, seemed to me they were trying to, you know, present themselves as members of the Grand Jury, you know, and there is a world of difference between Grand Jury members and IRS investigators. I'll tell the Grand Jury all kinds of things; I'm not going to tell the IRS a lot of things.

Wagner, 3/4/82 at 28–30.

 This testimony indicates that both the IRS investigators and the prosecutor represented that the investigators were working for or assisting the grand jury. While such conduct is improper under *Kilpatrick*, I cannot say that this isolated instance of impropriety requires dismissal of the indictment. Unlike *Kilpatrick*, the IRS investigators were not sworn in as "agents of the grand jury", nor did the prosecutors mislead the grand jury as to their role. Rather, when Special Agent Batson testified, his role as an IRS investigator was made clear to the grand jury, and he testified only in that capacity. There is no evidence that the grand jury relied on the IRS investigators as their "agents", or that their representations to

Wagner intruded upon the independence of the grand jury. In short, most of the abuses found in *Kilpatrick* requiring dismissal are not present in the instant case. Certainly, this conduct did not substantially impair, let alone usurp, the grand jury's independence. Thus, standing alone, this transgression is not sufficient to require dismissal of the indictment.

### B. Pocket Immunity

 Second, defendant asserts that three out of 22 witnesses received informal or "pocket" immunity. I condemned this practice in both *Anderson* and *Kilpatrick*. Grants of "pocket" immunity do not, however, require dismissal of the indictment.

In *Kilpatrick*, the prosecutors secured the testimony of no less than 23 witnesses by the use of "pocket" immunity. In granting this immunity, the prosecutors ignored entirely the federal immunity statute, 18 U.S.C. §§ 6001 et seq., which prescribes the congressionally authorized procedure for conferring grants of immunity. 594 F.Supp. 1324, 1336. Previously, I had described bestowal of "informal immunity" through "letters of assurance" as a "damnable practice". *United States v. Anderson*, 577 F.Supp. 223, 233 (D.Colo.1983). In *Kilpatrick*, however, I concluded that "[p]ocket immunity is illegal; when granting immunity, the Department of Justice must comply with the requirements of 18 U.S.C. §§ 6002 and 6003." 594 F.Supp. 1324, 1349. There, I held that "the repeated use of letters of assurance or so-called 'pocket immunity' ... violated the applicable statutes and tainted the grand jury with its illegality." 594 F.Supp. 1324, 1349. I did not hold, however, that use of informal immunity itself required dismissal of the indictment. Rather, I stated that

[t]he conventional remedy for illegal use of "pocket immunity" would, in most instances, take the form of a *post facto* grant of statutory immunity or the equitable enforcement of the pocket agreement, for the benefit of grand jury witnesses who relied on the prosecutor's

promises. These concerns are not before me here. Still, the use of pocket immunity was so pervasive in this case that it reflects upon the general conduct of the prosecutors and the grand jury. *Kilpatrick*, 594 F.Supp. 1324, 1349 n. 22.

In the present case, two witnesses, Loyd Brown and Rene Remund, were given informal immunity. Arguably, a third witness, E. Jay Erickson, was promised the equivalent of such immunity by the prosecutor when he stated to Mr. Erickson that "I was expecting that you were to be testifying here as a witness, not a target or subject of this investigation." Erickson, 5/4/82 at 2.

▬ Whether the government granted "pocket" immunity to three rather than two witnesses is inconsequential. Any use of such immunity is illegal. This is not to say, however, that the use of pocket immunity in this case constitutes grounds for dismissal of the indictment. As discussed above, any remedy would take the form of a *post facto* grant of immunity; not dismissal. Moreover, unlike *Anderson* and *Kilpatrick*, the use of "pocket" immunity in the instant case was not so pervasive as to taint the grand jury with its illegality. Thus, I cannot conclude that it interfered, substantially or otherwise, with the independence of the grand jury.

C. Mischaracterization of Evidence

Third, defendant asserts that IRS Special Agent Batson improperly summarized witnesses' testimony before the grand jury and mischaracterized evidence. Defendant argues that, under *Kilpatrick*, this conduct requires dismissal of the indictment. In *Kilpatrick*, I condemned both the use of summaries which were misleading and mischaracterization of the evidence. There, two separate grand juries were involved. The first grand jury heard testimony from several witnesses and received other evidence. Instead of recalling these witnesses to appear before the second, indicting grand jury, the government attorneys used the "grand jury agents" to summarize this evidence and testimony in front of the sec-

ond grand jury. 594 F.Supp. 1324, 1329. These summaries contained numerous inaccuracies and were misleading in several respects. 594 F.Supp. 1324, 1330. I held that such mischaracterization of the testimony intruded upon the independent role of the grand jury. 594 F.Supp. 1324, 1349; *see also Samango*, 607 F.2d 877, 883–84.

In the instant case, three separate grand juries were involved. Most of the witnesses testified before the first two grand juries. The third grand jury, which returned the indictment against defendant, received testimony only from IRS Special Agents Batson and Hector. Although this grand jury had the opportunity to recall witnesses who appeared before the first two grand juries, the members instead chose to accept transcripts of those witnesses' testimony. The transcripts were marked as exhibits. According to the United States Attorney, the grand jurors had the opportunity to read each of these transcripts before returning the indictment against defendant.

▬ Contrary to defendant's allegation that Special Agent Batson summarized witnesses' testimony before the grand jury, a review of Batson's testimony reveals that he was merely identifying the exhibits or transcripts which contained witness testimony. Thus, defendant's contention that Special Agent Batson improperly summarized witnesses' testimony is without merit.

Defendant's claim that Special Agent Batson mischaracterized evidence is also meritless. Specifically, defendant asserts that Special Agent Batson led the grand jury to believe that no evidence existed that defendant operated a church "despite clear evidence to the contrary." According to defendant, material to the indictment is proof that defendant had a likely source of *taxable* income and was not entitled to claim income exempt as derived from legitimate church activities.

The existence of this church, let alone its legitimacy, is far from "clear." Several witnesses had testified that defendant *represented* to them he was a minister and operated a church. Patricia Reichert,

9/9/81 at 3, 41; Paul Moran, 1/6/82 at 8; Steve Wagner, 3/4/82 at 6, 21; Lyle Ferch, 3/5/82 at 11; Philip Andert, 9/27/82 at 12; Rene Remund, 4/8/82 at 39. Only one witness, Alden Kautz, testified that he had ever attended any of defendant's church services. Alden Kautz, 3/4/82 at 44. In fact, defendant's ex-wife, Donna Turner, essentially characterized defendant's church as a sham:

> Q And is it your understanding that he opened up these various churches—what is your understanding as to why he had so many different churches?
>
> A So he wouldn't have to pay taxes.
>
> Q Did he ever tell you that?
>
> A Yes.

Donna Turner, 9/9/81 at 15.

Regarding the issues of whether defendant was a minister and operated a bona fide church, Special Agent Batson testified as follows:

> Q Okay. Now, does Mr. Turner on Exhibit 20 list his occupation?
>
> A Yes, he lists his occupation as a minister?
>
> Q And how about on Exhibit 21?
>
> A Also listed as a minister.
>
> Q Okay. Now, has your investigation discovered whether or not Don Turner or Donald K. Turner actually was a minister?
>
> A Yes, I did determine that, and to the best of my ability, I found no instance where he served in the capacity as a minister, nor did he have members of his church.
>
> \* \* \* \* \* \*
>
> Q ... Did he purport to have a minister—or to have a church to anybody else except on those returns?
>
> A He did purport to be a minister to some other people.
>
> Q Okay. And did he have some church or did he ostensibly have a church?
>
> A He ostensibly had a church called New Life Chapel.
>
> Q Did you find a place, an actual physical location called the New Life Chapel?
>
> A I found a particular address, 5660 South Syracuse Circle that was referred to in various documents as being the location of New Life Chapel.
>
> \* \* \* \* \* \*
>
> Q Okay. Did you go and take a look at that location?
>
> A Yes, I did.
>
> Q What did you find at that address?
>
> A I found at that address not a church, but a business that was conducted out of that suite.
>
> \* \* \* \* \* \*
>
> JUROR: I was just wondering why he was channeling money through this New Chapel to make it look like it was coming from there and that he was a minister. Is that his idea?
>
> Q (By Mr. O'Rourke) Well is the income of a church taxable?
>
> A The income of a church is not taxable if it's a church organization.
>
> Q Does a church have to meet certain standards or requirements to be considered a church for tax purposes?
>
> A Yes, they do.
>
> \* \* \* \* \* \*
>
> Q Do you find that Mr. Turner, for example, had a congregation or members of his church?
>
> A No, I found no members of his church.
>
> Q Did you find indications that he—that he, in fact, didn't have a church except in name?
>
> A Yes, I did. I found several witnesses who testified that he did not have any members of the church, he did not hold any church services and had, in fact, made disclosures to them that the only purpose for the church was to disguise his income and make it nontaxable.

Batson, 2/19/85 at 10–12, 34–35.

Special Agent Batson's testimony reflects that, at all times, he was testifying as to his own personal knowledge of the investigation of this case. Agent Batson did not deny that there were some indicia of defendant's alleged ministry. Rather,

he testified that he had investigated these issues and could not substantiate defendant's claims that he was a minister or that a bona fide church existed. There is nothing in his testimony that indicates that Agent Batson mischaracterized evidence on these issues. The grand jury was simply not "overreached or deceived in some significant way, as where perjured testimony has knowingly been introduced." *Samango*, 607 F.2d 877, 882. Thus, defendant's claim of mischaracterization is without merit.

### D. Extraneous Prejudicial Information

 Defendant also asserts as error the interjection by the prosecutor of extraneous prejudicial information. During the testimony of Raymond Gross, the prosecutor asked if the business that defendant was involved in in 1972 was a "pyramid scheme". Gross answered that he knew it was. Raymond Gross, 9/9/81 at 3. Defendant contends that this "type of question has no place in the grand jury room and only served to invite the grand jury to the conclusion that ... [he] was a con-man, even as early as 1972." Although "courts have ... held that a prosecutor may not make statements or argue in a manner calculated to inflame the grand jury unfairly against an accused," *Hogan*, 712 F.2d 757, 759, there is no indication that the prosecutor's question in the instant case was calculated to inflame the grand jury. A grand jury does not have to conduct its investigation with blinders on. Nor must we assume that members of a grand jury have abnormal sensibilities which would be inflamed by such an isolated and innocuous question. Thus, defendant's objection is without merit.

### E. Testimony by the Prosecutor

Patricia Reichert, defendant's secretary, was the first witness to testify before the grand jury during its investigation of this case. At several points during her testimony, the government prosecutor used leading questions. Additionally, the prosecutor essentially testified when he attempted to explain complicated factual and legal concepts to the grand jury. Defendant contends that this type of behavior threatened the grand jury's independence. The question, however, is not whether the grand jury's independence was threatened, but whether it was in fact usurped.

In support of this contention, defendant cites *Samango*. There, the Ninth Circuit found that the transcript of a witness' testimony was a source of prejudice to the defendant. 607 F.2d 877, 883. The court determined that "throughout the questioning, it was the prosecutor who actually supplied the testimony" by his use of leading questions. 607 F.2d 877, 883.

 In the instant case, the prosecutor's use of leading questions and his answers in response to grand juror's questions was insignificant in the context of the entire transcript. Certainly, unlike *Samango*, this transcript does not reveal that it was actually the prosecutor who supplied the witness' testimony. As the government correctly points out, the few leading questions which were used did not force the suggested answer from the witness. In most cases, Ms. Reichert did not give the expected answer and even clarified misapprehensions apparent in those questions. Thus, although the prosecutor did use leading questions to some extent, and did directly answer grand jury members' questions at one point, I simply cannot conclude that this conduct was "flagrant to the point" that the grand jury's ability to exercise independent judgment was impaired. *See Pino*, 708 F.2d 523, 530.

### F. Government Agent in the Defense Camp

Defendant next argues that, as in *Anderson*, the government utilized an agent in the defense camp in violation of his constitutional rights and that this conduct warrants dismissal of the indictment. In *Anderson*, government agents covertly infiltrated the defendants' organization. At least one agent, using questions prepared by the United States Attorney's office, induced defendants to discuss both their

business ventures and the on-going grand jury proceedings. This agent then testified before the grand jury, answering specific questions by the U.S. Attorney about legal strategy and defenses the defendants discussed using in the event of an indictment. Members of the grand jury also asked the agent questions about how he was going to maintain his cover in defendants' organization. These questions were followed by the U.S. Attorney's instruction to the agent that " 'the grand jury would like you to maintain your cover with regard to this aspect ... and attempt to develop a sufficient amount of probable cause ... in order to obtain a search warrant for [Lowell Anderson's] offices.' " 577 F.Supp. 223, 231.

In holding that this conduct constituted grounds for dismissal, I stated that

[t]he infiltration, and [particularly] the manner of its presentation to the grand jury, graphically demonstrates the collapse of the independent functioning of the grand jury, by the U.S. Attorney and investigating agents as well.... A grand jury that becomes intimately involved in planning an undercover agent's activities and maintaining his cover is no longer standing between the prosecutor and the citizenry as an independent evaluator of the evidence; it becomes a cabal.

*Anderson*, 577 F.Supp. 223, 231.

■■■■ By contrast, in the instant case, there is no indication that the grand jury was involved in the conduct alleged. Defendant contends that Pauline Adams, a secretary in his office, took documents belonging to him and turned them over to IRS agents. Defendant fails, however, to show how this alleged conduct destroyed the independence of the grand jury. There is absolutely no indication that any of these documents were presented to the grand jury. Moreover, none of the grand jury transcripts reveal that Ms. Adams testified or that the grand jury was ever made aware of her purported role in the investigation of this case. Since there was no involvement of the grand jury, its ability to function independently was not usurped.

Government infiltration alone is not grounds for dismissal of an indictment.

## G. Marital Privilege and Pre-Indictment Delay

■■■■ Finally, defendant requests that I consider two other instances of alleged misconduct as further evidence of a purported pattern of prosecutorial abuse in this case. First, defendant contends that his ex-wife's testimony before the grand jury encompassed confidential communications with him. Private, confidential communications between a husband and wife are, of course, privileged. *Wolfle v. United States*, 291 U.S. 7, 14, 54 S.Ct. 279, 280, 78 L.Ed. 617 (1934); *Trammel v. United States*, 445 U.S. 40, 45 n. 5, 100 S.Ct. 906, 909 n. 5, 63 L.Ed.2d 186 (1980). The indictment is not subject to dismissal, however, for violation of the marital privilege. *See, e.g., United States v. Calandra*, 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974). Further, even though defendant's marital privilege was violated, this instance of impropriety was isolated. I cannot say that Donna Turner's testimony regarding privileged communications infringed, let alone usurped, the grand jury's independence. See, for illustration, Judge Learned Hand's dissent in *United States v. Remington*, 208 F.2d 567, 571 (2d Cir.1953).

■■■■ Second, defendant claims that the pre-indictment delay in this case further indicates prosecutorial overreaching of the grand jury. Most of the witnesses testified before the first two grand juries between September 1981 and September 1982. Testimony did not resume until February 1985 before the third grand jury. This delay alone, however, does not give rise to an inference that the grand jury's role was somehow usurped. Nor is there any indication that this delay was intended by the government to gain some kind of tactical advantage. Instead, defendant again points to an isolated instance of misconduct and argues that it requires dismissal or evidences a pattern of abuse when in fact there exists not even the slightest indication of the deliberate misconduct by

the government found in *Anderson* and *Kilpatrick*. Without such evidence of deliberate misconduct, defendant's claim is without merit.

## II.

■ As discussed above, none of the alleged instances of misconduct per se require dismissal of the indictment. Nor can I conclude that the cumulative effect of any of these purported errors operated to impair the grand jury's independence. These incidents are not deliberate, "flagrant", or substantial, even when taken as a whole. Unlike *Anderson* and *Kilpatrick*, the grand jury's role and independence were not usurped or destroyed by the government attorneys.

IT IS THEREFORE ORDERED THAT:

1. Defendant's motion to dismiss the indictment is denied.

2. A hearing is scheduled for Friday, November 1, 1985 at 8:15 a.m. on all remaining motions.